**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| In re GROUPON, INC. SECURITIES LITIGATION | Master File No.: 12 CV 2450 <br><br> <u>Class Action</u> <br><br> JURY TRIAL DEMANDED |
| This Document Relates To <br> ALL CASES | Hon. Charles R. Norgle |

**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

Lead Plaintiff Michael Carter Cohn ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his Consolidated Amended Class Action Complaint against Defendants, alleges upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters, based on, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things: a review of wire and press releases published by and regarding Groupon, Inc. (NASDAQ: GRPN) ("Groupon" or the "Company"); Defendants' public statements, documents, conference calls and announcements; Securities and Exchange Commission ("SEC") filings; securities analysts' reports and advisories about the Company; a private investigation including interviews of certain former Groupon employees; consultation with a leading accounting expert; and information readily obtainable on the Internet.

## NATURE OF THE ACTION

1.      This is a securities fraud class action brought on behalf of all persons or entities who: (1) purchased or otherwise acquired Groupon common stock pursuant and/or traceable to the Company's Registration Statement and Prospectus, issued in connection with to its November 4, 2011 initial public offering (the "IPO" or the "Offering") seeking to pursue remedies under §§11, 12(a)(2) and 15 of the Securities Act of 1933 (the "Securities Act"); and (2) purchased or otherwise acquired Groupon common stock during the period from February 8, 2012 through and including March 30, 2012, seeking to pursue remedies under §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 (the "Exchange Act Sub-class").   This case arises from the material misrepresentations Groupon made to investors in connection with its IPO and fourth quarter 2011 ("Q4 2011") earnings report regarding Groupon's financial results, accounting practices and internal controls.

2.      Groupon is an internet marketing company with lofty ambitions – it aims to transform entirely the way that consumers purchase from local businesses.  Groupon is doing nothing short of "inventing a new industry," according to its Chief Executive Officer, Defendant Andrew Mason ("Mason").   Groupon uses its massive membership base to sell discounted vouchers (also eponymously called "groupons") for goods and services offered by third-party merchants:

> The site offers subscribers (44 million and counting) at least one deal a day in their city—say, half-off for sushi dinner or a spa treatment. But Groupon's innovation is the collective buying model suggested by its name: group plus coupon. A certain number of people need to buy into any given deal before it kicks in, or "tips" in Groupon parlance.  Once the deal tips—for example, 200 people have purchased a $40 coupon for an $80 massage—the merchant and Groupon split the revenue roughly 50/50, and a group of customers has an unbeatable bargain.

"Groupon's $6 Billion Gambler," *The Wall St. Jorunal,* December 20, 2010.[1]

3.      Groupon calls its business a "two sided marketplace," matching its enormous email list of bargain-hunting consumers with merchants looking to add new customers.  In the road show preceding its IPO,[2] Groupon depicted the marketplace graphically as follows:



---

[1] As Groupon grew, the minimum purchase threshold became insignificant.  In correspondence filed with the SEC on July 14, 2011, Groupon indicated that "less than 1%" of deals offered failed to meet this minimum threshold.

[2] An IPO road show consists of one or more presentations by an issuer of securities to potential buyers intended to generate interest for a public offering.  Typically, these presentations are limited to institutional investors.  However, Groupon posted a presentation of its road show on the internet, where it could be viewed by the investing public.  The official site has since been removed, but an archived copy of the presentation remains available at: http://www.businessinsider.com/watch-andrew-mason-present-the-groupon-roadshow-2011-10.

Groupon operates as a service provider in this model. To merchants, it provides performance-based advertising, earning a portion of the price of each voucher sold. To consumers, it provides access to a curated selection of heavily-discounted buying opportunities, and guarantees satisfaction with a 100% money-back refund on all purchases.

4.      Groupon's innovative marketing concept garnered enormous interest from both local merchants and bargain-hunting consumers. Mason boasted that "[t]here's never been anything—radio, TV, newspaper, whatever—that could generate small business sales so quickly." *See* "Meet the Fastest Growing Company Ever," *Forbes,* August 31, 2010. Because of this success, Groupon enjoyed "insane" growth in the period leading up to its IPO, according to Defendant Eric P. Lefkofsky ("Lefkofsky"). A chart used by Defendant Mason in the IPO road show confirms that virtually all of its revenues were attributable to "unprecedented growth" rather than continuing business:



5. Unfortunately, during the Class Period, Defendants attempted to extend their creativity to financial reporting. "We don't measure ourselves in conventional ways," Defendant Mason proclaimed in a letter to investors. Commentators saw it differently. Groupon was "accounting challenged," Francine McKenna wrote in *Forbes* after the Class Period. *See* "Groupon: Ernst & Young's Accounting Challenged Client," *Forbes,* April 23, 2012. Specifically, Groupon accelerated revenue recognition of refundable sales in violation of Generally Accepted Accounting Practices ("GAAP"), and misrepresented to the SEC that it had the historical evidence and internal controls required to utilize this favorable accounting treatment, when in fact it did not.

6. Accounting standards unquestionably required Groupon to defer revenue recognition until the refund period expired or until it had: (a) generated a large amount of

verifiable historical data involving homogenous transactions to substantiate a reasonable refund estimate; and (b) implemented internal controls necessary to timely and reliably estimate refunds. Groupon did not have such historical data and had not implemented such internal controls at the time of its IPO or at the time it announced Q4 2011 earnings. Accordingly, it was required to defer accrual of this revenue until the refund period expired.

7. The limited historical refund data Groupon had only involved a fraction of its merchant partners and business lines, and in virtually every case fell far short of the two years' worth of data from homogenous transactions required by authoritative accounting standards. *See* Section VI. As Groupon spokesman Paul Taaffe conceded, Groupon's historical data was of little value: "Every three months, Groupon is a different company."[3] Taaffe was correct. At the time of its IPO, most of Groupon's transactions involved deals that Groupon had never promoted before, offered by merchants and bought by customers with which Groupon had little or no historical experience. In many cases, the deals were from entirely new lines of business that Groupon had launched only months earlier.

8. Groupon's lack of historical data was exacerbated by its own limited visibility and deficient internal controls. The Company had no control over the quality of the goods and services it sold, and as it ultimately conceded, did not have effective procedures to reliably assess refunds. To make matters worse, Groupon staffed its accounting department with inexperienced and unqualified temporary workers.

9. Without the data or competence to reasonably calculate refunds, Groupon had to defer revenues under GAAP. *See* Section VI. In violation of these rules, Groupon impermissibly accelerated revenue recognition to the time of sale– even for sales in new lines of

---

[3] Associated Press, "Groupon Restatement Sparks More Worries," April 2, 2012, available at http://www.washingtontimes.com/news/2012/apr/2/groupon-restatement-sparks-more-worries/.

business, areas like high-priced and medical services that its CEO, Defendant Mason, described as having an inherently higher refund rate, and offerings of merchants for which Groupon had no track record whatsoever.

10.    Groupon used its impermissible refund accounting to boost the amount of revenues and reduce the operating losses it claimed in the amended registration statement it filed with the SEC on Form S-1A on October 31, 2012 ("Registration Statement"), and in all subsequent amendments thereof, as well as in the prospectus it delivered to investors in connection with the IPO and filed with the SEC on Form 424B4 on November 7, 2011 ("Prospectus").  Groupon also omitted from the Registration Statement and Prospectus material adverse information regarding defects in critical financial controls.   Defendants used the materially false and misleading Registration Statement and Prospectus to sell over $715 million in Groupon common shares to unsuspecting investors, achieving an extremely favorable valuation.

11.    By the time Groupon announced its earnings for the Q4 2011on February 8, 2012, Groupon and its senior executives knew or recklessly disregarded that Groupon could not substantiate its refund accounting and revenue acceleration.  They knew that Groupon had no refund data at all for about half of its merchants at the time it booked the revenues, knew that many of the sales were from product lines which only months earlier did not exist, and knew that Groupon had doubled down on the sales in the fourth quarter that had inherently higher refund rate – higher-priced services, medical services which required screening by the provider, and travel deals subject to hotel availability.   Moreover, Groupon had been warned in September 2011 that it faced a substantial refund risk going forward.

12.     Whether due to recklessness, or a desire to present favorable results at all costs, Groupon and its senior management continued to use the improper accounting when they reported Q4 2011 results to investors on February 8, 2012.  Although Groupon had actually lost approximately $15 million, by improperly accelerating revenue and violating GAAP, Groupon reported to investors that it had achieved the opposite result: an operating profit of $15 million, its first operating profit since early 2010.

13.     As forensic accounting expert Howard Schilit explained in *CFO Journal*, Groupon's revenue recognition was wholly improper.  Groupon had to defer revenue recognition until the refund period because its inability to reasonably estimate future refunds foreclosed it from qualifying for accelerated recognition:  "Everything would have to be deferred revenue until the end of the refund period," he said.[4]  *See* "Groupon's Accounting Revision Turns on FAS 48," *CFO Journal*, April 3, 2012.  Dr. Schilit is the founder of Center for Financial Research & Analysis and the author of *Financial Shenanigans: How to Detect Accounting Gimmicks & Fraud in Financial Reports* (2nd Edition, March 2002).

14.     In an article on CFO.com, accounting standards expert Ashwinpaul Sondhi confirmed that the treatment was improper: "You should be able to come up with a reasonable and reliable estimate of return before you're permitted to recognize revenue. It appears Groupon did not have that ability."  *See* "Groupon Restatement Raises Reserving Questions," CFO.com,

---

[4] Correspondence between Groupon and the SEC indicates that Groupon's executives understood the accounting rules governing their financial reporting.  *See* Letter to SEC dated July 14, 2011 (acknowledging that its accounting was governed by Staff Accounting Bulletin Topic 13(A)(4)(a), which  only allows accelerated recognition of "refundable fees for service" if strict criteria are met), available at:  http://www.sec.gov/Archives/edgar/data/1490281/ 000104746911006336/filename1.htm.  Groupon simply misrepresented to the SEC that it met the strict requirements for such accelerated recognition, when it did not.  *See id.;* Paragraphs 79 to 80 below.

April 2, 2012. Dr. Sondhi is a member of the Emerging Issues Task Force (EITF) of the Financial Accounting Standards Board (FASB), and serves on the Investor Advisory Group (IAG) of the Public Company Accounting Oversight Board (PCAOB). He also co-authored the 2006-2009 editions of the *CCH Revenue Recognition Guide*.

15. Groupon's improper refund accounting was disclosed after the market closed on Friday, March 30, 2012, when it filed its first audited financial report as a public company on Form 10-K ("2011 10-K"), and amended its Q4 2011 earnings report on Form 8-K/A ("March 30, 2012 8-K/A"). In these filings, Groupon revealed: (a) that it had failed to properly account for refunds in Q4 2011; (b) that, as a result, it had materially misstated previously reported Q4 2011 and Full-Year 2011 revenue, operating income (loss), operating expense, net income (loss), earnings (loss) per share, and cost of revenue; and (c) that it had material weaknesses in its internal controls, particularly those controls intended to ensure the accurate and timely estimate of customer refunds, and the proper closing of financial reporting periods. These were precisely the risks concealed by Defendants' misrepresentations and omissions.

16. As a result of these revelations, Groupon's stock plummeted. On Monday, April 2, 2012, the first trading day following Groupon's disclosures, the Company's stock closed on extraordinarily high volume of 10.09 million shares at $15.28 – a single-trading-day decline of $3.10 or 16.9% from its prior close, and a decline of $4.72, or 23.7% from its IPO price. The following day, after reports surfaced that the SEC was investigating these disclosures, prices fell another $.26, or 1.7%, to $15.02.

<u>**JURISDICTION AND VENUE**</u>

17. The claims asserted herein arise under Sections 11, 12(a)(2) and 15 of the Securities Act, 15 U.S.C. §§ 77k and 77o and under Sections 10(b) and 20(a) of the Exchange

Act, 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

18.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa and Section 22 of the Securities Act, 15 U.S.C. § 77v.

19.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, Section 22 of the Securities Act, 15 U.S.C. § 77v, and 28 U.S.C. § 1391(b). Defendant Groupon is headquartered in this district; Defendant Groupon, the Individual Defendants and Underwriter Defendants conduct business in this district, and wrongful conduct at issue took place in this district.

## PARTIES

20.     Lead Plaintiff Michael Carter Cohn purchased shares of Groupon common stock pursuant and/or traceable to the Company's materially untrue and misleading Registration Statement at various times during the Class Period, and suffered damages as a result of the federal securities law violations alleged herein.

21.     Defendant Groupon Inc. is a Delaware corporation with its principal executive offices located at 600 West Chicago Avenue, Suite 620, Chicago, Illinois 60654. Groupon is a internet marketing company that connects local and national merchants to consumers by offering discounted vouchers for goods and services. Groupon went public via a November 4, 2011 IPO, and is actively traded on the NASDAQ Global Select exchange under the ticker symbol "GRPN."

22.     Defendant Eric P. Lefkofsky ("Lefkofsky") was at all relevant times the Company's Chairman of the Board of Directors ("Board"). He is also a Co-Founder of Groupon.

Defendant Lefkofsky signed and caused to be filed with the SEC the materially false and misleading Registration Statement in connection with the IPO.

23.     Defendant Andrew D. Mason ("Mason") was at all relevant times the Company's Chief Executive Officer ("CEO").  Defendant Mason is also a Co-Founder of Groupon.  He signed and caused to be filed with the SEC the materially false and misleading Registration Statement in connection with the IPO.

24.     Defendant Jason Child ("Child") was at all relevant times the Company's Chief Financial Officer.  Defendant Child signed and caused to be filed with the SEC the materially false and misleading Registration Statement in connection with the IPO.

25.     Defendant Kevin Efrusy ("Efrusy") was at all relevant times a member of the Company's Board and an Audit Committee Member.  Defendant Efrusy signed and caused to be filed with the SEC the materially false and misleading Registration Statement in connection with the IPO.

26.     Defendant Theodore J. Leonsis ("Leonsis") was at all relevant times a member of the Company's Board and the Chairman of the Audit Committee.  Defendant Leonsis signed and caused to be filed with the SEC the materially false and misleading Registration Statement in connection with the IPO.

27.     Defendant Howard Schultz ("Schultz") was at all relevant times a member of the Company's Board and an Audit Committee Member.  Defendant Schultz signed and caused to be filed with the SEC the materially false and misleading Registration Statement in connection with the IPO.

28.     The Registration Statement stated that under the Audit Committee charter to be effective upon completion of the IPO, the Audit Committee was to be responsible for, *inter alia*,

11

"monitoring the integrity of our financial statements and our compliance with legal and regulatory requirements as they relate to financial statements or accounting matters," "reviewing the adequacy and effectiveness of our internal control policies and procedures," and "reviewing with management and the independent auditors our interim and year-end operating results."

29.     Defendant Joseph M. Del Preto was at all relevant times the Company's Chief Accounting Officer ("CAO").  He signed and caused to be filed with the SEC the materially false and misleading Registration Statement in connection with the IPO.

30.     Defendants Lefkofsky, Mason, Child, Efrusy, Del Preto, Leonsis and Schultz are sometimes collectively referred to herein as the "Individual Defendants."

31.     Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") was the primary underwriter of the Company's IPO and assisted in the preparation and dissemination of Groupon's IPO materials.  Additionally, Morgan Stanley acted as representative for all of the underwriters involved in the Groupon IPO.  Morgan Stanley's main offices are located at 1585 Broadway, New York, NY 10036.

32.     Defendant Goldman, Sachs & Co. ("Goldman Sachs") was an underwriter of the Company's IPO and assisted in the preparation and dissemination of Groupon's IPO materials.  Additionally, Goldman Sachs acted as representative for all of the underwriters involved in the Groupon IPO.  Goldman Sachs's headquarters are located at 200 West Street, New York, NY 10282.

33.     Defendant Credit Suisse Securities (USA) LLC ("Credit Suisse") was an underwriter of the Company's IPO and assisted in the preparation and dissemination of Groupons's IPO materials.  Additionally, Credit Suisse acted as representative for all of the

underwriters involved in the Groupon IPO. Credit Suisse has its principal U.S. location at 11 Madison Avenue, New York, New York 10010.

34. Defendants Morgan Stanley, Goldman Sachs, and Credit Suisse are sometimes collectively referred to herein as the "Underwriter Defendants."

35. Defendant Groupon, the Individual Defendants, and the Underwriters Defendants are sometimes collectively referred to herein as "Defendants."

## **SUBSTANTIVE ALLEGATIONS**

**I.      Groupon's Business Model.**

36. Groupon sells heavily discounted vouchers on behalf of its merchant partners for goods and services to a growing base of subscribers via email, mobile application and Groupon's website. The Registration Statement contained two examples of how these deals are advertised on Groupon's website:



37. When a customer purchases a deal from Groupon, three things occur: (1) the customer receives a voucher that can be can be printed or stored on a subscriber's cell phone using Groupon's mobile application; (2) Groupon remits the merchant's share – usually 50-60% of the amount paid by the customer – to the merchant in three payments over a period of sixty

(60) days; and (3) Groupon grants the customer a 100% money-back satisfaction guarantee called the Groupon Promise.

38.    A customer can redeem a voucher by presenting it to the merchant prior to its expiration date – usually six or nine months after the deal was featured by Groupon.   As Defendant Mason explained at a Goldman Sachs investor conference on February 16, 2012, customers typically redeem vouchers most heavily in the month following purchase and the month preceding expiration.   Vouchers that expire cannot be used to obtain the advertised promotion, and are not protected by the Groupon Promise.   Under Groupon's current merchant contracts, expired vouchers can continue to be redeemed at the merchant for the original purchase price paid by the customer, though not for the advertised promotional value. Groupon's website contains an example of a printed voucher:



**Groupon Number**
**#0501-GA**

# $20 for Food and Drinks at Woodfire Pizza

## 50% off food and drinks

Promotional value EXPIRES October 8, 2011. You can always use this
Groupon voucher for the amount you paid ($10), which NEVER EXPIRES.


1234–5678



### The Fine Print

Limit 1 per person, may buy 1 additional as a gift. Limit 1 per visit. See below for complete rules.

### Redeem at

600W Chicago Ave
Chicago, IL 60654
(312) 555-7680

303E Wacker Drive
Chicago, IL 60601
(312) 555-7690

*2 more locations*

### How to Use This

1. Print voucher (or use our mobile app)
2. **Reservation required.** Visit http://gr.pn/iR4eJ or call (555) 555-7585 and mention your voucher.
3. Present voucher to server when seated.
4. Tip generously on the full bill amount!

### Rules That Apply to All Deals

These are the restrictions that apply to every Groupon voucher (unless the Fine Print specifies an exception).

**Value of the Groupon Voucher**
This voucher has two separate values: (a) the amount you paid; and (b) the promotional value. The amount you paid will never expire. The promotional value is the additional value beyond the amount you paid, and it will expire on the expiration date above (unless prohibited by law).

**Redemption and Refund**
Redeemable only at Woodfire Pizza for the goods or services listed above. If the merchant refuses to honor this voucher, Groupon will refund the purchase value.

**Other Rules**
Not redeemable for cash (unless required by law). Doesn't cover tax or gratuity. Promotional value can't be combined with other offers. Not reloadable. Unauthorized reproduction, resale, modification, or trade prohibited. Woodfire Pizza is the issuer of this voucher. Purchase, use or acceptance of this voucher constitutes acceptance of these terms. This voucher is transferrable. For more information, visit http://www.groupon.com/terms.

**We're here to help**   (877) 788-7858 | support@groupon.com | Mon-Fri 9am-5pm CST

II.     **Groupon's "Fanatical" Refund Policy.**

39.     All of Groupon's vouchers are backed by a 100% money-back, no questions asked, satisfaction guarantee called the Groupon Promise that the Company describes as "fanatical."   *See* "Groupon's 6 Billion Gambler," *The Wall St. Journal*, Dec. 20, 2010. Defendant Mason explained in the IPO road show that the extreme approach helped it attract customers: "the Groupon Promise came from asking ourselves what would it take for us to buy a Groupon from an unknown business."

40.     As Defendant Mason explained, "any customer can return a groupon, no questions asked—even if they have used it—if they feel that Groupon has let them down."  *See* "Groupon's $6 Billion Gambler," *The Wall St. Journal,* Dec. 20, 2010.  Groupon described the Groupon Promise to the SEC as a "completely open return policy" that is "an integral, intangible element of each Groupon voucher" and "provides that the Company's customers will receive a refund of the entire purchase price of the Groupon in the event the merchant is unable or fails to deliver in a satisfactory manner the goods or services that are the subject of the Groupon."  *See* Groupon Letters to SEC filed on August 10 and 29, 2011.

41.     Groupon's "open return policy" is dramatically more generous than the limited refund policy of Groupon's largest competitor, LivingSocial, and the policy for the voucher business of another publicly-traded competitor, TravelZoo.  LivingSocial generally only allows refunds for one week after a customer purchases a voucher:

> LivingSocial will provide a refund if you contact us within seven days after you've purchased your voucher. After that, we provide refunds upon request in cases where you are unable to redeem a voucher because the merchant has gone out of business before the promotional period ends.

*See* LivingSocial website, http://help.livingsocial.com/articles/what-is-your-refund-policy.

16

Similarly, TravelZoo only provides refunds within a week of voucher purchase, and does not provide any refunds for used vouchers. *See* TravelZoo website, http://www.travelzoo.com/local-deals/terms-of-sale/.

### III.    Groupon Becomes "The Fastest Growing Company Ever."

42.    In the year before its decision to go public, Groupon was lauded as the "Fastest Growing Company Ever." *See* Paragraph 4. However, it began much more modestly. Groupon was spun out of an earlier venture that Defendants Mason and Lefkofsky launched in November 2007 called ThePoint.com, a website intended to gather people together for collective social action. ThePoint.com's twist was that the social action would only move forward if enough members had agreed to participate. Mason promoted the site with a series of publicity stunts, including an attempt to gain support to build a glass dome over the City of Chicago.

43.    The "glass dome" stunt provided just enough media exposure to attract the attention of venture capitalists. In January 2008, ThePoint.com raised $4.8 million from leading venture capital firm New Enterprise Associates. However, by fall of 2008, ThePoint.com's backers were demanding that Mason and Lefkofsky find a way to monetize the website, or shut it down.

44.    Mason thought that the technology behind ThePoint.com could also be used for collective purchasing. He negotiated a deal with the pizzeria on the ground floor of his office building in the Near North Side of Chicago to offer a voucher entitling the buyer to two pizzas for the price normally charged for one, but only if a minimum number were sold. The experiment was a success. Twenty buyers took advantage of the deal, and Groupon was born.

45.     Groupon grew moderately from November 2008 to mid-2009, but continued to serve only Chicago and offer only a single deal each day.  By mid-2009, Groupon was sending its email to about 200,000 members and had generated just over $1 million in gross billings.

46.     At that time, Groupon expanded to other U.S. cities, beginning with Boston, and started to grow at a pace that its Chairman, Defendant Lefkofsky, described as "insane."[5] Defendants Child and Mason soon concluded that Groupon could recover its cost to acquire a new customer in less than a year.  In a November 30, 2011 presentation at the Credit Suisse Technology Conference, Mason called this revelation an "aha" moment – one which drove them to "put the pedal to the medal and invest as aggressively as we can in new customer acquisition."

47.     As Groupon's Registration Statement highlighted, Groupon achieved the rapid growth it intended.   Between the second quarter of 2009 and the third quarter of 2011 – the last quarter before its IPO – virtually all of Groupon's metrics demonstrated a meteoric expansion:

> We increased our revenue from $1.2 million in the second quarter of 2009 to $430.2 million in the third quarter of 2011. We generated these revenues from gross billings of $3.3 million for the second quarter of 2009 as compared to gross billings of $1,157.2 million for the third quarter of 2011.
>
> ****
>
> We expanded from five North American markets as of June 30, 2009 to 175 North American markets and 45 countries as of September 30, 2011. Revenue from our international and North American operations was $268.7 million and $161.5 million, respectively, in the third quarter of 2011.
>
> We increased our subscriber base from 152,203 as of June 30, 2009 to 142.9 million as of September 30, 2011. A total of 43,014 customers purchased Groupons through the end of the second quarter of 2009 as compared to 29.5 million through the end of the third quarter of 2011, including 16.0 million customers who have purchased more than one Groupon since January 1, 2009.
>
> We increased the number of merchants featured in our marketplace from 212 in the second quarter of 2009 to 78,649 in the third quarter of 2011.

---

[5]   *See* Lefkofsky interview, available at: http://www.builtinchicago.org/blog/bootstrapping-eric-lefkofsky-tastytrade.

We sold 116,231 Groupons in the second quarter of 2009 compared to 33.0 million Groupons in the third quarter of 2011.

We grew from 37 employees as of June 30, 2009 to 10,418 employees as of September 30, 2011.

Registration Statement at 1.

48.     As Groupon spokesman Paul Taaffe acknowledged, because of this rapid growth, Groupon became "a different company" every few months.   Charts contained in the Registration Statement confirm that most of Groupon's customers were new, and the Company would therefore lack historical purchasing and refund data for these customers.  One third had joined in the two quarters preceding the IPO, and more than three-quarters had joined in the year preceding the IPO:



The Company had no more history or data on its international customers, which were also almost all relatively new subscribers:



*Id.* at 80.

49.    Groupon similarly lacked significant experience with most of its merchant partners, whose services and goods Groupon was guaranteeing with the Groupon Promise. The majority of the merchants referenced in Groupon's Registration Statement did not even have a business relationship with Groupon prior to 2011:



*Id.* at 84. This was also true in international markets:



**International Merchants Featured**

*Id.* In fact, as Defendant Mason admitted in his road show presentation, at the time of the IPO, about half of Groupon's merchant partners had not offered even one prior deal with the Company.

50.     In part, this increase in merchants was enabled by a change in the business model that Groupon called alternately its "reinvention" or "Groupon 2.0." Prior to 2011, Groupon featured only one deal per day per city, and had an enormous backlog of merchants that wanted to participate. In some cities, the backlog grew as long as a year. To alleviate this backlog and take advantage of the growing number of new merchants that wanted to be featured in Groupon's promotions, the Company underwent a radical transformation, discarding the "one deal per day" premise upon which it had previously operated. Instead, Groupon began to offer multiple deals each day, using personalization technology to adapt its emails to the gender, buying history, and preferences of its customers. This allowed Groupon to vastly expand its merchant base, or as

22

Groupon boasted during the IPO road show, to "execute on previously unaddressable opportunities."

51.     The Company compounded this growth in the first half of 2011 by expanding into several entirely new lines of business, including travel (Groupon Getaways), live events (Groupon Live), "instant" or short-duration deals (Groupon Now!), and direct sales of products (Groupon Goods). As Defendant Mason explained in the IPO road show, these new businesses were already important to Groupon though they had only operated "for a few months" before the IPO.

**IV.     Groupon's Initial Misleading IPO Filings.**

52.     From the time that Groupon filed its initial IPO registration statement on June 2, 2011, it did not comply with GAAP.

53.     First, Groupon tried to claim as its own revenues all of the funds it collected for its merchant partners. Accounting professors Anthony Catanch (Villanova University) and Edward Ketz (The Pennsylvania State University) described the problem as follows:

> This means that if the Company sells a coupon for $40 promising $80 in services, it records the entire $40 as revenue, despite its having to remit 50% or more of the coupon proceeds to the merchant that actually provides the goods or services. Has Groupon really earned $40 (gross revenue recognition) or $20 (net recording, Groupon's actual marketing commission).
>
> ***What's the big deal you ask? Only that the Company has overstated its actual revenue by 154.82% in 2010 and 178.81% in 2009.*** Real revenue is really what the Company reports as gross profit.

"Trust No One, Particularly Not Groupon's Accountants," Grumpy Old Accountants Blog, August 24, 2011 (emphasis added), available at http://blogs.smeal.psu.edu/ grumpyoldaccountants/archives/281. While this and other sources contained various criticisms at the time of the IPO, Groupon expressly admonished investors that they should not rely on

23

external sources and instead only rely on the Registration Statement and Prospectus in assessing the offering.  *See* Registration Statement at 1.

54.  As Catanach and Ketz noted, however, Groupon's accounting treatment directly violated the guidance provided by the SEC in Staff Accounting Bulletin ("SAB") 101:

> This example [topic 10 of SAB 101] mirrors Groupon's fact pattern except that in the example, the internet company actually sells products (not coupons), and offers no "satisfaction guarantee."  Even in this case the SEC concludes that revenue should be reported NET not GROSS, since the internet company:
>
> - Did not take title to the products,
>
> - Did not have the risk and rewards of ownership, and
>
> - Acted as an agent or broker.
>
> Clearly, Groupon should report its revenue NET, not gross.  And the Company's CFO should have known better given his tenure with Amazon as a finance VP in Asia (and as an accountant with Arthur Andersen).  Amazon's revenue recognition policy clearly states:
>
> If we are not primarily obligated, and do not have latitude in establishing prices, amounts earned are determined using a fixed percentage, a fixed payment schedule, or a combination of the two, we generally record the net amounts as commissions earned.

*See* http://blogs.smeal.psu.edu/ grumpyoldaccountants/archives/281.

55.  Catanach and Ketz filed a whistleblower complaint with the SEC.  Thereafter, the SEC forced Groupon to cease this GAAP violation.  On September 8, 2011, Groupon had a conference call with SEC staff, after which it committed in writing to present only its own share of gross billings as revenues in subsequent amendments of its registration statement.  *See* Groupon Letter to SEC, filed September 16, 2011.[6]

---

[6] According to SEC spokesman John Nester, the SEC does not publish this correspondence until at least 20 days *after* an IPO, in part to emphasize that the company, and not the SEC, is responsible for its own disclosures.  *See* "Facebook Fought SEC To Mute Mobile Risks Before IPO," *Bloomberg BusinessWeek*, Oct. 10, 2012, available at: http://www.businessweek.com/news/2012-10-10/facebook-fought-sec-to-keep-mobile-risks-

56.     Groupon also tried to understate operating expenses by inventing a metric it called ACSOI.  ACSOI stripped from operating income Groupon's customer acquisition expenses and stock-based compensation expenses.  As Catanach and Ketz explained, ACSOI "pretend[s] that stock-based compensation and acquisition-related costs are unimportant when they are very real costs that the entity has incurred.  Instead of being transparent, managers who eliminate these items are merely trying to find a nonnegative number to report."  "Groupon CFO's Spin Raises More Red Flags," Grumpy Old Accountants Blog, Feb. 15, 2012, available at: http://blogs.smeal.psu.edu/grumpyoldaccountants/archives/530.

57.     Groupon used ACSOI accounting to show positive adjusted operating income for both fiscal year 2010 and the first quarter of 2011.  However, Groupon had posted operating losses of $420 million in 2010 and $117.1 million for the first quarter of 2011.  *See* "Groupon Updates IPO Filing, Admits It's Unprofitable," CNN.com, August 10, 2011, available at http://money.cnn.com/2011/08/10/technology/groupon_accounting/index.htm?source=cnn_bin. By letter dated July 22, 2011, the SEC told Groupon that the exclusion of marketing expenses was "potentially misleading" and asked that the ACSOI metric be removed.  In response, Groupon removed its presentation of ACSOI calculations from the Registration Statement.

58.     In addition to the repeated deviations from accounting standards, Defendants Lefkofsky and Mason both made impermissible promotional statements during the pre-IPO "quiet period."  To avoid misleading promotional activity and ensure that information is properly conveyed to investors through Registration Statement filings, insiders are legally restricted from making promotional statements until after the offering is declared effective.  Despite this restriction, a day after Groupon filed its S-1, Defendant Lefkofsky told Bloomberg that Groupon

hidden-before-ipo-crash.  As such, this and other letters referenced in this Complaint were not available to investors prior to the Class Period.

would be "wildly profitable" and was already a "great business."[7]   Later in the quiet period, Defendant Mason sent a lengthy promotional email to thousands of employees which was predictably leaked within hours to the media.  In text vetted by Defendants Lefkofsky and Child, Defendant Mason touted "unprecedented growth" and wrote:

> I'll summarize my excitement with four points: 1) Growth in our core business is strong 2) Our investments in the future — businesses like Getaways & NOW — look great, 3) We are pulling away from competition, and 4) We've built a great team that I would pit against anyone. In other words, all the stuff that one would want to look good? It looks good.

*See* Mason email dated August 25, 2011, copied in Registration Statement at A-1.  After the SEC criticized these improper promotional activities, Groupon inserted language into its Registration Statement advising investors to disregard the statements.  However, by that time, the hype had already served its purpose, generating buzz and reaching millions of investors through endless repetition in the business press.

## V.      Defendants Use Materially False Representations In Their Registration Statement And Prospectus To Raise $715 Million From Public Investors.

59.     After several formal letters between SEC staff and Groupon regarding deficiencies in Groupon's IPO filings, the Company grudgingly revised its registration statement to remove the grossly improper attempt to claim merchant revenues as Groupon's own, and the distorted ACSOI metric.  However, Groupon's amended registration statement did not comply with GAAP.  Instead, it simply replaced one misleading revenue measure with another.

---

[7] Groupon is not the first company that Lefkofsky attempted to inflate through false hype. *Fortune* magazine reported that Lefkofsky said with respect to another of his companies, Starbelly: "Lets start having fun... lets get funky... let's announce everything... let's be WILDLY positive in our forecasts... lets take this thing to the extreme... if we get wacked [sic] on the ride down-who gives a shit... THE TIME TO GET RADICAL IS NOW... WE HAVE NOTHING TO LOSE..."  *See* "The Checkered Past of Groupon's Chairman," *Fortune,* June 10, 2011, available at: http://tech.fortune.cnn.com/2011/06/10/groupon-eric-lefkofsky/    With this "radical" hype, Lefkofsky was able to successfully sell Starbelly to another company called Ha-Lo Industries for $240 million, much of which went Lefkofsky. Not long after the transaction, Ha-Lo declared bankruptcy. *Id.*

60.     On October 31, 2011, Groupon filed the operative Registration Statement, which still violated GAAP and presented Groupon's operating results and internal controls in a materially misleading manner.  The following day, by letter to the SEC, Defendant Mason requested on behalf of Groupon that the SEC declare the Registration Statement effective on an accelerated basis by 3:00 p.m. on November 3, 2011 without further review, pursuant to SEC regulations that permitted such acceleration as long as the issuer acknowledges its responsibility to comply with federal securities laws.  In the November 3, 2011 letter, Defendants Groupon and Mason expressly acknowledged:

> (a)     that a declaration of effectiveness would "not foreclose the Commission from taking any action with respect to the Registration Statement;"
>
> (b)     that a declaration of effectiveness "would not relieve Groupon from its full responsibility for the adequacy and accuracy of the disclosure in the Registration Statement;" and
>
> (c)     that "Groupon may not assert the declaration of effectiveness as a defense in any proceeding initiated by the Commission or any person under the federal securities laws of the United States."

*See* Letter filed November 1, 2011 with the SEC, available at: http://www.sec.gov/Archives/edgar/data/1490281/000104746911008885/filename1.htm.   As a result of these acknowledgements, the SEC declared the Registration Statement effective as requested.

61.     Thereafter, on November 3, 2011, Defendants increased the size of the offering by an additional 5.75 million shares, priced the IPO at $20 per share, and distributed a Prospectus to investors repeating the same misrepresentations contained in the Registration

Statement.    *See* Form S-1 MEF dated November 3, 2011, available at http://www.sec.gov/Archives/edgar/data/1490281/000110465911060758/0001104659-11-06075 8-index.htm; Prospectus dated November 3, 2011 and filed with SEC November 7, 2011, available at http://www.sec.gov/Archives/edgar/data/1490281/000104746911009142/000104746 9-11-009142-index.htm.

62.    The following day, November 4, 2011, pursuant to the misleading Registration Statement and Prospectus, Defendants sold a total of 35.75 million Groupon shares to public investors at $20 per share.   The offering raised approximately $715 million, including approximately $45 million for the Underwriter Defendants.   The Company's IPO – the ninth-largest ever according to *The Wall St. Journal* – was viewed at the time as a resounding success.

63.    The successful offering was made possible by a Registration Statement and Prospectus that materially inflated Groupon's financial results and omitted crucial adverse information regarding Groupon's accounting practices and weaknesses in Groupon's internal controls.

64.    In particular, the Registration Statement and Prospectus each misrepresented that Groupon had grown its revenue to $430.2 million in the third quarter of 2011, and $1,118.3 million for the first nine months of 2011.   These statements were false and misleading when made because: (a) the figures included sales subject to a right of refund that under GAAP could not be recognized as revenue until after the refund period expired; (b) as a result of (a), Groupon had not actually achieved $430.2 million in revenue during the third quarter of 2011 or $1,118.3 million for the first nine months of 2011, which would have been apparent had Defendants presented Groupon's financial results consistent with GAAP; and (c) Groupon lacked sufficient

internal controls to determine the proper amount of revenue, to reasonably estimate reserves for future refunds, and to properly close its accounts at the end of an accounting period.

65.     The Registration Statement and Prospectus each misrepresented that Groupon had achieved revenue per subscriber of $11.6 in the first nine months of 2011.  These statements were materially false and misleading when made because: (a) the figures included sales subject to a right of refund that under GAAP could not be recognized as revenue until after the refund period expired; (b) as a result of (a), Groupon had not actually achieved revenue per subscriber of $11.6 in the first nine months of 2011, which would have been apparent had Defendants presented Groupon's financial results consistent with GAAP; and (c) Groupon lacked sufficient internal controls to determine the proper amount of revenue, to reasonably estimate reserves for future refunds, and to properly close its accounts at the end of an accounting period.

66.     With respect to Groupon's revenue recognition policies, the Registration Statement and Prospectus each stated the following:

> We recognize revenue from Groupons when the following criteria are met: persuasive evidence of an arrangement exists; delivery has occurred; the selling price is fixed or determinable; and collectability is reasonably assured. These criteria are met when the number of customers who purchase the daily deal exceeds the predetermined threshold, the Groupon has been electronically delivered to the purchaser and a listing of Groupons sold has been made available to the merchant. At that time, our obligations to the merchant, for which we are serving as an agent, are substantially complete. Our remaining obligations, which are limited to remitting payment to the merchant and continuing to make available on our website the listing of Groupons previously provided to the merchant, are inconsequential or perfunctory. We record as revenue the net amount we retain from the sale of Groupons after paying an agreed upon percentage of the purchase price to the featured merchant excluding any applicable taxes. Revenue is recorded on a net basis because we are acting as an agent of the merchant in the transaction.

Registration Statement at 67.   These statements were materially false and misleading when made because: (a) Defendants omitted that this accelerated revenue recognition policy did not comply with GAAP, which required Groupon to defer revenue until the refund had expired or the

amount of refunds could be reasonably estimated; and (b) at the time a listing had been made, Groupon's obligations to the merchant were not substantially complete; to the contrary, Groupon remained obligated to refund the voucher purchase price – including the merchant's share – to dissatisfied customers.

67.     The Registration Statement and Prospectus each described Groupon's accounting treatment of refunds as follows:

> At the time revenue is recorded, we record an allowance for estimated customer refunds primarily based on historical experience. We accrue costs associated with refunds in accrued expenses on the consolidated balance sheets. The cost of refunds where the amount payable to the merchant is recoverable is recorded in the consolidated statements of operations as a reduction to revenue. The cost of refunds under the Groupon Promise, when there is no amount recoverable from the merchant, are presented as a cost of revenue. To the extent the refund is provided to a subscriber, we record the expense within selling general and administrative expense in the consolidated statements of operations.

These statements were materially false and misleading when made because: (a) Groupon did not qualify for reserve accounting of its refundable sales under GAAP; (b) Groupon lacked sufficient homogenous historical data required under GAAP to reasonably estimate the amount of future refunds for virtually all of its sales; and (c) Groupon lacked sufficient internal controls to determine the proper amount of revenue, to reasonably estimate reserves for future refunds, and to properly close its accounts at the end of an accounting period.

68.     The Registration Statement and Prospectus each affirmatively misrepresented compliance with GAAP.  Each stated: "The Company's consolidated financial statements were prepared in accordance with United States generally accepted accounting principles ('U.S. GAAP')."  These statements were materially false and misleading when made because: (a) Groupon's financial statements were not prepared in accordance with U.S. GAAP; (b) in particular, Groupon's revenue was inflated due to impermissible acceleration of sales subject to a

right of refund even though Groupon did not meet the strict requirements for acceleration under SAB Topic 13 and SAB 104; and (c) as a result of Groupon's inflation of revenue, Groupon's operating results and net earnings were also materially inflated and Groupon's refund reserve was improperly recorded.

69.     The Registration Statement and Prospectus each also stated: "As we do not have control over our merchants and the quality of products or services they deliver, we rely on a combination of our historical experience with each merchant and online and offline research of customer reviews of merchants for the development of our estimate for refund claims."[8]  These statements were materially misleading when made because they omitted the following adverse information: (a) Groupon did not have sufficient historical experience with each merchant to satisfy the strict requirements for making a reasonable refund estimate under SAB Topic 13 and SAB 104; (b) Groupon's reliance on "online and offline reviews" instead of verifiable refund data was not reasonable and did not comply with FASB and SEC guidance; (c) many of the sales were in entirely new lines of business where Groupon had little or no verifiable historical refund data; and (d) Groupon lacked sufficient internal controls to reasonably estimate future refunds.

**VI.     Groupon's Accelerated Revenue Recognition Violated GAAP.**

**a.     GAAP Prohibits Recognition Of Refundable Sales Prior To Expiration Of Refund Period Unless Refunds Can Be Reasonably Estimated With Verifiable Data.**

70.     SEC Regulation S-X, 17 C.F.R. Part 210, requires management of companies registering for public offerings to ensure that financial statements are presented in accordance with GAAP.  It is a fundamental principle of accounting under U.S. GAAP that revenue may not

---

[8] These were reviews from third-party sites, not reviews gathered or verified by Groupon.  As Defendant Mason admitted on the February 8, 2012 earnings call, Groupon did not bother obtaining reviews from its customers until "four, five months" earlier, *i.e.,* September-October 2011.

be recognized unless it is both "realized" and "earned." These two criteria are set forth in the

Financial Accounting Standards Board's ("FASB") Concept Statement 5 (paragraph 83), and in

numerous accounting standards and accounting literature governing revenue recognition,

including the SEC's SAB Topic 13 and SAB 104. Professor Ronald Dye, Leonard Spacek

Professor and former Chairman of the Department of Accounting and Information Management

at the Kellogg School of Business, Northwestern University,[9] explains these two criteria as

follows:

> In short, revenue is "realized" in a sales transaction when the firm's customer gives the firm cash, or claims that can be readily converted into cash, and the firm has the right to retain those funds or claims. Revenue is "earned" when the firm has performed substantially all that it needs to do related to the product or service the firm is supplying to the customer related to the sale.
>
> Where the customer has a right of refund, and there is considerable uncertainty about the volume of refunds customers will request, the amount of cash or claims that the firm can expect to retain is not reasonably known until the refund period lapses. Therefore, the revenues related to such sales are not realized until the refund period is over.

71.     To avoid recording unrealized revenue in the case of refundable sales, SEC SAB

Topic 13 and SAB 104 each warn against recognizing revenue before the refund period expires:

> Generally, the staff believes that *a sales price is not fixed or determinable when a customer has the unilateral right to terminate or cancel the contract and receive a cash refund.* A sales price or fee that is variable until the occurrence of future events (other than product returns that are with the scope of Statement 48) generally is not fixed or determinable until the future event occurs. The revenue from such transactions should not be recognized in earnings until the sales price or fee becomes fixed or determinable. Moreover, revenue should not be recognized in earnings by assessing the probabilty that

---

[9] Professor Dye provides background factual information on the accounting principles at issue in this case. In addition to being a tenured professor and former department chair at the Kellogg School of Business, Professor Dye also serves on the editorial boards of the *Journal of Accounting Research, Journal of Accounting and Economics,* and the *Review of Accounting Studies,* and has authored more than 40 papers appearing in these and other leading academic accounting journals. Professor Dye has reviewed Groupon's Registration Statement, Q4 2011 earnings announcement, revised Q4 2011 earnings announcement, and 2011 10-K as well as the FASB and SEC materials on revenue recognition cited herein, and related accounting literature.

> significant, but unfulfilled, terms of a contract will be fulfilled at some point in
> the future.  Accordingly, ***the revenue from such transactions should not be
> recognized in earnings prior to the refund privileges expiring.***

SAB Topic 13(A)(4)(a), Response to Question 1; SAB 104 at  54-55 (emphasis added).

72.     Instead, the SEC makes clear that "the preferable accounting method for services

subject to potential refunds"[10] and "the most direct authoritative literature to be applied on the

extinguishment of obligation under such contracts" is set forth in Statement of Financial

Accounting Standards ("FAS") 140, and also in FASB ASC Topic 860.  *See* SAB Topic

13(A)(4)(a), Responses to Question 1 and 4; SAB 104 at 56, 64,  FAS 140 and FASB ASC Topic

860 each provide that refundable sales should be recorded initially as a monetary liability (*i.e.,*

deferred revenue), and shifted to revenue (technically, derecognized as a liability and recognized

as revenue) only when the refund obligation lapses.

73.     GAAP requires service firms that offer their dissatisfied customers the right to

receive refunds of their payments for service following the provision of the service to satisfy

stringent criteria in order to be allowed to deviate from this "preferable accounting method" and

"book" (i.e., record in their financial statements) revenues related to the services they render

prior to the expiration of the refund period. If any of these stringent criteria is not satisfied,

service firms are not permitted to accelerate the recognition of revenue and, instead, must defer

recording revenue until the refund period expires.  According to Professor Dye,

> Accounting standard setters have long been concerned that companies with
> refund policies may try to book sales that ultimately fail to materialize because
> customers request refunds of those sales after trying the companies' products
> or services.    To forestall firms from recognizing revenue on such "phantom"
> sales, both the SEC and GAAP permit such companies to accelerate the

---

[10] Accounting literature on the treatment of service revenue is controlling because Groupon is
primarily a service provider, *see* Paragraph 3, and, furthermore because the refund accounting
misrepresentations at issue relate primarily to service deals.  In fact, sales of Groupon Goods are
not protected by the Groupon Promise, but instead are subject only to a 14-day right of return.
*See* http://www.groupon.com/faq,

recognition of revenues associated with refundable sales from the end of the refund period to the time of sale, and adjust their reserves for estimated refunds, only if specific criteria are met to reasonably ensure that the companies are recording revenue that is both earned and realized. For sales of products subject to a right of return, the criteria are established in FAS 48 and related staff accounting bulletins, especially SAB Topic 13, SAB 101, and SAB 104. Sales of services subject to a right of refund are not part of FAS 48; however, SEC staff has stated that it would allow analogous treatment to service providers in limited circumstances where specific criteria are met. For refundable sales of services, the criteria for revenue acceleration are specified in SAB Topic 13 and SAB 104. If the criteria of FAS 48, SAB Topic 13, SAB 101 and SAB 104 are not met, as applicable, revenue cannot be accelerated and must be accounted for in the manner provided by FAS 140.

74. FAS 48, implemented over three decades ago, makes clear that revenue on sales of products subject to a right of return cannot be recognized on an accelerated basis prior to the expiration of the refund period unless all of six specific conditions are met, including the absolute requirement that the amount of future refunds be reasonably estimable:

Criteria for Recognizing Revenue When Right of Return Exists

6. *If an enterprise sells its product but gives the buyer the right to return the product, revenue from the sales transaction shall be recognized at time of sale only if all of the following conditions are met*:

a. The seller's price to the buyer is substantially fixed or determinable at the date of sale.

b. The buyer has paid the seller, or the buyer is obligated to pay the seller and the obligation is not contingent on resale of the product.

c. The buyer's obligation to the seller would not be changed in the event of theft or physical destruction or damage of the product.

d. The buyer acquiring the product for resale has economic substance apart from that provided by the seller.

e. The seller does not have significant obligations for future performance to directly bring about resale of the product by the buyer.

f. *The amount of future returns can be reasonably estimated* (paragraph 8).

*Sales revenue and cost of sales that are not recognized at time of sale because the foregoing conditions are not met shall be recognized either when*

34

> ***the return privilege has substantially expired or if those conditions subsequently are met, whichever occurs first***.

FAS 48, Paragraph 6(b) (emphasis added).

75.     FAS 48 recognizes that there are many circumstances which can impair a company's ability to reasonably estimate the amount of future returns:

> 8. The ability to make a reasonable estimate of the amount of future returns depends on many factors and circumstances that will vary from one case to the next. However, the following factors may impair the ability to make a reasonable estimate:
>
> a. The susceptibility of the product to significant external factors, such as technological obsolescence or changes in demand
>
> b. ***Relatively long periods in which a particular product may be returned***
>
> c. ***Absence of historical experience with similar types of sales of similar products***, or inability to apply such experience because of changing circumstances, for example, changes in the selling enterprise's marketing policies or relationships with its customers
>
> d. ***Absence of a large volume of relatively homogeneous transactions***
>
> The existence of one or more of the above factors, in light of the significance of other factors, may not be sufficient to prevent making a reasonable estimate; likewise, other factors may preclude a reasonable estimate.

*Id.,* Paragraph 8 (emphasis added).

76.     The SEC expressly warned public companies in SAB 101 that they must adhere to FAS 48, Paragraphs 6 and 8: "The staff reminds registrants that ***if a transaction fails to meet all of the conditions of paragraphs 6 and 8 in FAS No. 48, no revenue may be recognized*** until those conditions are subsequently met or the return privilege has substantially expired, whichever occurs first." *See* SEC Staff Accounting Bulletin 101, Paragraph 9, published December 3, 1999, available at: http://www.sec.gov/interps/account/sab101.htm (emphasis added). SAB 101 and Topic 13 are two of the most important guidance documents on revenue

recognition, and certainly are known to senior financial executives serving financial reporting functions in public companies.

77. Where the revenues in question were derived from the sale of a service, the SEC has allowed treatment analogous to FAS 48 in two circumstances:

    (a)     <u>Sales of refundable memberships</u>: where the sale involves a membership subject to a right of refund, the SEC has stated that it will allow accelerated revenue recognition similar to that permissible under FAS 48 only if:

        (i)     "estimates of terminations or cancellations and refunded revenues are being made for a large pool of homogeneous items;"

        (ii)     "reliable estimates can be made on a timely basis;"

        (iii)     "there is a sufficient company-specific historical basis on which to base the estimates, and the company believes such historical experience is predictive of future events;" and

        (iv)     the membership price is fixed and determinable other than the right of refund.

*See* SAB Topic 13(A)(4)(a), Response to Question 1; SAB 104(A)(4)(a), Response to Question 1 (same).

    (b)     <u>Other limited circumstances</u>: the SEC has also stated that it will allow accelerated recognition in a manner analogous to FAS 48 of "service transactions subject to customer cancellation privileges other than those specifically addressed" in its analysis of refundable membership fees where:

    (i)       there exists "a large pool of homogenous data," which the SEC defines to mean *at least two years* in a particular line of business or class of service:

> The staff typically expects that the historical experience be based on the particular registrant's historical experience for a service and/or class of customer. In general, the staff typically expects a start-up company, a company introducing new services, or a company introducing services to a new class of customer to have at least two years of experience to be able to make reasonable and reliable estimates; and

    (ii)      each of the other criteria for accelerated recognition of refundable membership revenues, as set forth in subparagraph (a) above, are satisfied.

*See* SAB Topic 13(A)(4)(a), Response to Question 2 and footnote 55; SAB 104(A)(4)(a), Response to Question 2 and footnote 55 (same).

78.     In SAB 101, the SEC reiterated that two years' experience is generally required to assess the refund rate for a new service, a new line of business, or a new class of customer:

> Paragraph 8 of [FAS 48] notes various factors that may impair the ability to make a reasonable estimate of returns, including the lack of sufficient historical experience. The staff typically expects that the historical experience be based on the particular registrant's historical experience for a service and/or class of customer. *In general, the staff typically expects a start-up company, a company introducing new services, or a company introducing services to a new class of customer to have at least two years of experience to be able to make reasonable and reliable estimates.*

SAB 101, Question 7, footnote 40 (emphasis added).

**b.     Groupon Could Not Qualify For Revenue Acceleration Under GAAP.**

79.     When the SEC questioned Groupon's aggressive accounting prior to the IPO, Groupon claimed to apply SAB Topic 13(A)(4)(a), and falsely stated that it qualified for accelerated revenue recognition under the strict requirements of that authority:

[SEC] Comment No. 65

*It appears that the "Groupon Promise" is unconditional. In light of your rapid growth and entry into new markets, explain to us why you believe the amount of future refunds is reasonably estimable. Tell us the variance between your estimates and actual refund claims. We note your disclosure on page 17.*

[Groupon] Response:

The Company's policy is to defer revenue recognition for the amount of purchase price refunds expected to be ultimately granted at the time of the transaction. Further, based on the criteria in SAB Topic 13.A.4, the Company believes it has the ability to make a reasonable estimate of those potential returns at the time the voucher is purchased.  Those criteria include:

•   the estimate of refunds are made for a large pool of homogeneous items;

•   reliable estimates of refunds can be made on a timely basis;

•   there is sufficient specific historical basis upon which to estimate the refunds, and the Company believes that such historical experience is predictive of future events; and

•   the amount of the transaction is fixed at the outset of the arrangement.

The Company uses a rolling average of the historical refund percentages for all historical months excluding any outliers in order to determine the estimated refund percentage.  Obvious outliers are excluded from the analysis as these percentages are not indicative of future refunds (particularly for the earlier months of the Company's existence).  This analysis is done for each type of currency in which the Company transacts. While the Company has a relatively limited history of operations, taking into consideration the sheer volume of transactions (approximately 60 million Groupons sold) as well as the lack of any material change in the refund percentage over time provides the Company comfort that its analysis is reasonable.

While the Company is rapidly growing and expanding into new markets, it does not believe this hinders its ability to make this estimate.  For example, as the Company deals with more and more merchants, it does not believe the characteristics of its merchants within a geographical region differ from one another such that it would materially affect the Company's estimates.  Further,

based on the Company's historical experiences to date, it has not noted significantly different trends from one geography to another that would have a material effect on its reserve amount.

The Company notes that refunds historically have averaged approximately 4% of revenue from its inception through the present, including during periods of rapid growth.[11] Therefore, it is the Company's position that the amount of future refunds is reasonably estimable.

*See* Letter of Groupon to SEC, filed July 14, 2011, at 34-35.

80.     These representations, which formed the cornerstone of Groupon's improper revenue accounting in its IPO and Q4 2011 earnings announcement, were manifestly untrue. Groupon lacked the historical data, experience, and internal controls ***required*** under Topic 13 and other SEC and FASB guidance to calculate a "reasonable estimate" of refunds. To the contrary, Groupon demonstrated numerous factors that FASB and SEC guidance warned would make such a determination inherently unreasonable and unreliable.

### (1) Groupon had little or no verifiable refund data for virtually all of its merchant partners.

81.     Groupon did not even come close to possessing the two years of refund data expressly referenced in Topic 13, SAB 101, and SAB 104. Although Groupon claimed in the Registration Statement to base its refund estimate principally on its "historical experience with each merchant," *see id.* at 17, at the time of the IPO, the Company had ***zero historical experience*** with about half of its merchants, which were trying Groupon and its novel discounting concept for the first time. With most other merchant partners, it had only a few months' experience. Groupon's lack of a historical relationship with its merchant partners was both a function of its rapid growth (Groupon "has operated at a substantial scale for only a

---

[11] At the time Groupon sent this letter to the SEC in July 2011, Groupon was still improperly claiming all of gross billings to be its revenue. *See* Paragraphs 53 to 55 above. Accordingly, Plaintiff understands the 4% reference in this letter to pertain to the figure that Groupon now calls gross billings.

limited period of time") and an intentional policy "to limit repeat merchants." Registration Statement at 11, 51.

82.     Moreover, when initially signing a merchant, Groupon did not collect verifiable data regarding their refund rates, nor would there be a reasonable basis to extrapolate the refund rates between existing customers of a company and new customers Groupon would attract only through heavy discounting and its "fanatical" refund policy.    Groupon also did not have verifiable refund information from other businesses offering similarly discounted vouchers for similar deals pursuant to a similar refund policy.    Thus, Groupon did not even have an external source of verifiable refund data.

> **(2)     Groupon had little or no experience in many of the product lines it had entered just prior to its IPO.**

83.     In the months preceding its IPO, Groupon expanded into numerous new product lines with which it lacked historical refund experience.

84.     <u>Travel</u>:  In June 2011, Groupon launched a travel business in partnership with Expedia, Inc. called "Groupon Getaways."    Groupon Getaways peddled an inventory of discounted travel destinations – primarily hotel and resort stays – to Groupon's customers. Groupon's travel deals raised particular problems with regard to estimation of refunds.   Groupon had not previously offered hotel and resort stays on a widescale basis to its customers.   Thus, Groupon lacked historical refund data not only with respect to the particular hotels and resorts it promoted, but with the travel business altogether.

85.     <u>High-priced services</u>:  In early 2011, Groupon started increasing its efforts to feature deals for high-priced services.   Confidential Witness ("CW") 1, a program coordinator at Groupon's Chicago headquarters from March 2011 until February 2012 reported that Groupon began to emphasize high-end deals at about the time he joined in March 2011.   CW 1 explained

that the huge change coincided with the Company's purchase of Livenation.com, an online provider of event ticketing. After that, "everything started to shift," according to CW 1. CW 1 attended an important "all hands" meeting in or around March 2011 at the Roosevelt Theatre, during which Defendant Mason and other executives told the approximately 1000 employees in attendance that "everything was going to be reinvented," and that the Company would emphasize higher-priced, higher-return deals to thwart off competition.

86.     According to CW 2, a senior account executive in Groupon's Manhattan offices from November 2011 to April 2012, Groupon focused on high-end deals during his tenure at the Company: "They wanted high-end deals as soon as I came in. They just started to focus on selling the high-end deals and didn't worry about the back end."   According to CW 2, the high-end deals had higher refund rates – something Groupon itself admitted at the end of the Class Period.   As Groupon also was ultimately forced to admit, it lacked the ability to reasonably assess the refund rates for such deals.

87.     <u>Medical and aesthetic services:</u>  One subset of Groupon's push into higher-priced deals caused particular refund problems – deals for medical and high-end aesthetic services like LASIK optical surgery and "cool sculpting," a noninvasive substitute for liposuction.  Groupon sold vouchers for these services without regard to whether its customers were medically qualified.   Customers who bought these high-end services and learned that they were poor candidates for the procedure (for example, having a prescription or optical condition not suitable for LASIK, or having a body fat percentage too high to effectively benefit from cool sculpting) would then seek and receive refunds from Groupon.  *See* Paragraphs 90 to 92 below.

88.     <u>Groupon Goods, Groupon Live, and Groupon Now!:</u>  In addition to Groupon Getaways and the high-priced medical/spa deals, between May and August 2011, Groupon

launched three other major lines of business. Groupon Goods was an attempt by Groupon to mass market daily product deals a national basis, launched August 2011. Groupon Live was a separate business unit selling concert and similar event tickets launched in May 2011, derived from Groupon's purchase of Livenation.com. Groupon Now! was a new business concept offering very short-term instant deals aimed at providing an immediate customer boost to local merchants. Groupon had no historical experience in any of these lines, and certainly lacked the large pool of historical refund data needed to substantiate such a refund estimate under GAAP.

### (3) Groupon's Refund Data Was Not Homogenous.

89. Historical refund data can only be used to support a reasonable estimate under SAB Topic 13 if the data involves homogenous transactions. The SEC defines "homogenous" to mean "service transactions with the same characteristics such as terms, periods, class of customers, nature of service, etc." *See* SAB Topic 13(A)(4)(a), Response to Question 1. While Groupon claimed to possess refund data for 60 million transactions, these transactions were not homogenous. Instead, Groupon's offerings involved different services, with substantially differing terms and refund periods. Even those deals that were not part of brand new business lines involved sales of widely varying services and goods. Groupon sold discounts on everything from a meal at a seafood restaurant in Louisville, Kentucky to eye surgery in Los Angeles, California to more esoteric offerings, like an intricate Japanese New Year's feast called "osechi" at a Tokyo restaurant and even a discounted circumcision in Manila, Philippines.

90. Moreover, Groupon did not experience a homogenous refund rate across deal types. Certain deal types, like medical deals and travel deals, had elevated refund rates. After the Class Period, in a JPMorgan investor conference on May 17, 2012, Defendant Mason admitted that medical deals had a "pre-baked-in" refund problem: "There are also higher price

point categories like LASIK eye surgery, where we actually sell these vouchers to customers knowing that they're going to have to go through a screening process to determine if they're even eligible, so there is a pre-baked-in expected refund rate that's inherent to those categories."

91.     Consistent with Mason's admission, numerous confidential witnesses have corroborated that Groupon's medical deals had higher refund rates.  CW 3, a customer service representative for Groupon in Chicago from June 2011 to August 2012, stated that many customers requested refunds on LASIK, cool sculpting, and similar deals for medical reasons.

92.     According to CW 4, an account representative with Groupon in Chicago from October 2010 to July 2012, Groupon learned in early 2011 that the medical service deals were subject to a higher refund rate than other Groupon deals.  In the Spring of 2011, CW 4 participated along with many other sales personnel in a conference call with Darren Schwartz, Groupon's Senior Vice-President of Sales.  Schwartz told the sales team that the Company was experiencing an unduly high refund rate from high-end deals like LASIK, and therefore Groupon would begin to pay its sales representatives a commission only on the successful redemption of a voucher rather than upon the sale of the voucher for these high-end deals.  CW 2 confirmed that the same information was conveyed to him in sales meetings after he started in November 2011 and by other sales employees.

93.     Similarly, Groupon's travel deals were subject to unique and often opaque restrictions that impacted a customer's ability to redeem a travel voucher and, consequently, the refund rate for such vouchers.  For example, a voucher for a hotel stay could only be utilized if the hotel could accommodate the Groupon customer at the time of desired travel:

> Unlike Expedia, Travelocity, Priceline, Jetsetter and nearly every other major travel provider, Groupon does not require consumers to pick their dates and confirm availability at the time of purchase. When a consumer finds he can't use his Groupon months later, he calls for a refund.

"Why Groupon is Poised for Collapse," VentureBeat, March 31, 2012, available at: http://venturebeat.com/2012/03/31/why-groupon-is-poised-for-collapse.   Moreover, unlike a restaurant where a Groupon customer could take any available table, many hotels and resorts limited the number of Groupon customers they accept at a time:

> Much like airlines, hotels divide their rooms into multiple inventory buckets. In order to use a Groupon, there must be availability in the Groupon bucket. Because of the low price that hotels receive for Groupon rooms, Groupon customers will be in one of the lowest availability buckets.

"Groupon Getaways Aren't The Deal They Seem To Be," GigaOm.com, September 14, 2011, available at: http://gigaom.com/2011/09/14/groupon-getaways-arent-the-deal-they-seem-to-be/. Also, Groupon's practice of obscuring restrictions on travel deals increased dissatisfaction and refunds: "To make matters worse, Groupon Getaways puts all of this fine print on a separate tab that most users will miss.   In contrast, Groupon partner Expedia, in its own non-Groupon product, puts the restrictions right on the front page in a prominent position."  *Id.*

94.     Even beyond medical and travel deals, Groupon's refund experience varied widely depending on the price of a deal.  As Defendant Mason admitted in the May 17, 2012 JPMorgan investor conference:

> So, as we move to a higher price point categories, a lot of those categories either had inherently higher refund rates. It just stands to reason that if you buy a $60 massage voucher, you are more likely to return it if you don't have a chance to use it, than you are $1 Dairy Queen Blizzard deal, which you might be happy to allow to just expire or if for whatever other reason you've had a bad experience, you won't use it, you won't pursue a refund, because it's not worth the time on the phone, right.

95.     Further, even for a single deal, Groupon's refund cost would vary by as much as 50%, depending on when the refund was requested.  As Felix Salmon explained in *Reuters*:

> The issue at hand is that of refunds, and how they're accounted for. Let's say that Groupon has managed to sell 240 coupons for "cool sculpting", at $500 apiece. That's a total of $120,000. The coupons expire on September 19, in six months' time.

44

Let's also assume that, as per usual, Groupon keeps 50% of the proceeds, and gives the other 50% to the merchant. In this case, it would keep $60,000 for itself, and remit $60,000 to Dr. Aron Kressel. But Dr. Kressel wouldn't get all the money up front. He gets one third, or $20,000, immediately. He gets another $20,000 after 30 days. And then he gets the final $20,000 after 60 days. That's May 18.

Now, Kressel might not get all of his $60,000. Let's say that some of the people who bought a coupon turn up for their initial consultation before May 18, and are told that they're not medically suitable for the treatment and therefore can't have it. Those people — let's say there are 20 of them — are eligible for a full refund from Groupon. So Groupon gives those people back their money, $10,000 in all, and holds back from Kressel his $5,000 share of that money. As a result, Kressel's final payment is not $20,000 but rather $15,000, and he ends up getting paid $55,000 in total by Groupon.

And at the same time, of course, Groupon's own revenues from the deal are also reduced to $55,000: the economics of selling 240 coupons and refunding 20 of them before May 18 are basically the same as the economics of selling 220 coupons and refunding none of them.

After May 18, however, things change. At that point, Kressel is paid out, but Groupon still has the Groupon Promise. As a result, if anybody gets turned away from Kressel's office after May 18, Groupon eats the whole refund. Let's say that appointments become easier to come by after May 18, and a further 50 people end up being told that they're not eligible for the procedure after that point. Remember that Kressel has already been paid $250 by each of those people, and doesn't need to repay the money if he finds them ineligible.

Those 50 people still get their refunds from Groupon — a total of $25,000. But in this case, all of that $25,000 comes out of Groupon's share of the revenues, and none of it comes out of Kressel's cut.

So what's the situation on September 19, when the deal expires? 240 coupons will have been sold, for an up-front total of $120,000. 70 of those coupons will have been refunded, bringing total revenues down by $35,000 to $85,000. And of those revenues, Kressel will have received $55,000, while Groupon will have received just $30,000 — a 65/35 split in favor of the merchant, rather than the 50/50 split originally envisioned.

And in fact it's possible for Groupon to lose money on the deal, if there are enough refunds after May 18.

"How Groupon Accounts For Its Deals," *Reuters.com*, April 3, 2012, available at:

http://blogs.reuters.com/felix-salmon/2012/04/03/how-groupon-accounts-for-its-deals/.

(4)   **Groupon's declining reserve ratio was inconsistent with its growing refund expense.**

96.   In addition to being derived from grossly deficient data and impaired by materially weak internal processes and inexperienced personnel, Groupon's purported estimate of future refunds varied substantially from year-to-year, demonstrating an instability that is inconsistent with reasonable estimation under Topic 13 and SAB 104. From 2009 to 2011, the amount of gross billings that Groupon reserved for future refunds declined precipitously from 8.6% to 1.79% to 0.94%, before the Company admitted that the latter estimate was unreliable and adjusted it upwards to 1.69%:

| (#s in thousands) | 2009 | 2010 | 2011 as reported[12] | 2011 as adjusted |
|---|---|---|---|---|
| Gross Billings | 34,082 | 745,348 | 4,002,506 | 3,985,501 |
| Refund Reserve | 2,932 | 13,398 | 37,452 | 67,452 |
| Percent reserved | 8.6% | 1.79% | 0.94% | 1.69% |

[**Sources**: Registration Statement; 2011 10-K; Feb. 8, 2012 Press Release; Mar. 30, 2012 8-K.]

As Professor Dye explained, these variances demonstrate that Groupon did not have the stable refund experience it claimed:

> For most companies, growth in sales is accompanied by commensurate growth in the components of working capital related to those sales, including receivables, inventories and allowances for doubtful accounts, and for companies providing a right of refund, accrued reserves for refunds. Changes in a company's accrued reserves for refunds that are not commensurate with changes in sales are by definition irreconcilable with a stable relationship between refunds and sales. Instead, such variation suggests that a company has experienced substantial changes in the mix of goods or services offered,

---

[12] The refund reserve used in connection with the blatantly incorrect financial results that Groupon reported on February 8, 2012 was not broken out as a line item in the press release. However, when Groupon announced revised results on March 30, 2012, it stated that its refund reserve of 67.452 million was an increase of approximately 30 million over the previous figure. Accordingly, the February 8, 2012 report apparently reflected a refund reserve of approximately 37.452 million.

> the classes of customers it targets, its refund reserve accrual rate, or the volume
> of refund requests received (or some combination of the preceding).

The variations in Groupon's refund reserve ratio further demonstrate that Groupon did not possess a stable historical refund experience, and could not possibly extrapolate its limited prior experience into a credible estimate for reserve accrual under SAB Topic 13.

97.     Moreover, while Groupon was slashing the amount of gross billings it retained in its refund reserve, its refund expense was skyrocketing. Full details regarding Groupon's refund expense are not publicly available because Groupon omitted disclosure of these figures in the Registration Statement and its 2011 10-K; however, figures provided in an exhibit to a letter to SEC staff indicate that Groupon had an emerging refund problem at least as early as June 2011. In a September 16, 2011 letter to the SEC, Groupon indicated that its refund expense *jumped over 10,000%* from the first six months of 2010 to the first six months of 2011, from $227,000 to $23.7 million. *See* Letter of September 16, 2011 Letter of Groupon to SEC, available at: http://www.sec.gov/Archives/edgar/data/1490281/000104746911008103/filename1.htm#toc_ge79808_1.

**(5)     Groupon could not timely and reliably estimate refunds.**

98.     As Groupon admitted after the Class Period, it did not maintain sufficient controls to accurately record and assess its reserve for refunds, and the estimations it did make were not reliable. *See* 2011 10-K for 2011 at 104; Paragraphs 125-126 below. Thus, it did not possess the capability to make "reliable estimates of refunds ... on a timely basis," as required by Topic 13 and SAB 104.

99.     In addition to lacking proper procedures, Groupon's internal controls were further hampered by inexperienced personnel. Groupon's Registration Statement only hinted at the problem:

>  Our management team has worked together for only a limited period of time and has a limited track record of executing our business plan as a team. We have recently filled a number of positions in our senior management and finance and accounting staff.  Accordingly certain key personnel have only recently assumed the duties and responsibilities they are now performing.

Registration Statement at 27.  However, confidential witnesses have explained that the problems were far worse than the Company had initially represented.  CW 2 said that Groupon "had a bunch of kids in accounting who didn't know what they were doing."  He said the Company's accounting department was overwhelmed by the number of deals Groupon was doing, and, as a result, the whole record-keeping process was behind.

100.    CW 5 confirmed that Groupon's accounting department was overwhelmed at the time of the IPO.  CW 5 was a temporary employee retained as an accounting assistant for Groupon between October 2011 and March 2012.  Her job was to manually download sales and refund data from Groupon's Salesforce.com database[13] that it used to manage sales into an Excel spreadsheet, where it was reconciled manually and uploaded for payment into the Company's Great Plains accounting software.  CW 5 said that the Company had become so busy by the fall of 2011 that its accounting department fell behind on reconciling merchant payments and refunds.

101.    CW 6 confirmed the lack of controls in Groupon's accounting department, where he was employed as a temporary worker from February 2012 to May 2012.  CW 6 said that the backlog in the accounting department was so severe that 30 to 40 temporary workers were hired.  Many lacked accounting or finance backgrounds, instead having degrees in areas like film and sociology.  According to CW 6, they "were like a bunch of kids."  He was surprised by their inexperience.  "There seemed to be no system of checks and balances," he said.

---

[13] Salesforce.com is an enterprise grade software product that Groupon used to document and manage its relationships with merchant partners, and monitor the performance of deals and trends within its business on a realtime basis.

### (6) Groupon's consideration of reviews was improper and did not cure its lack of real historical refund data.

102.    Groupon impermissibly attempted to cure its lack of significant historical refund data for virtually all of its merchant partners by relying on "online and offline research of customer reviews of merchants." *See* Registration Statement at 17.  However, these unverified and often anonymous reviews could not substitute for actual refund data under authoritative guidance and are not reliable.  First, nothing in SEC or FASB guidance recognizes "reviews" to be valid evidence from which refund estimates can be modeled.  Second, academic research indicates that such reviews are often inflated and unreliable, resulting in higher reported satisfaction ratings than those that Groupon subscribers report for the same institutions:

> In their most recent study, [Boston University Professor John] Byers and his co-authors, Michael Mitzenmacher and Giorgos Zervas, theorize that "reviews from Groupon subscribers are lower on average because such reviews correspond to real, unbiased customers, while the body of reviews on Yelp contain some fraction of reviews from biased or even potentially fake sources."

"Using Groupon Deals? Your Yelp Score May Suffer," *Huffington Post*, April 11, 2012 (also noting that the study, which analyzed over 7 million Yelp reviews, found a 12% disparity between ratings by Groupon users and overall ratings).  Third, if anything, the online reviews refuted the notion that Groupon's deal quality – and to the extent that reflected refund rates, the refund rate – remained stable over time.  Instead, the reviews suggested that Groupon was doing deals with more and more lower-quality merchants in 2011, a factor that would increase not decrease refund requests:

> Have you had the feeling the quality of Groupon deals is going down? If so, you're right. A report released this morning by Giorgos Zervas, a postdoctoral fellow of computer science at Yale University, shows that the average rating of a Groupon merchant before a deal runs is declining as Groupon matures. Zervas and other researchers had shown earlier that a business's individual

Yelp[14] ratings dropped after running a Groupon. Yelp ratings by Groupon customers were, on average, 10% lower than those of their peers. (Disclosure: I met Zervas after the initial study and offered my theory that the average Yelp rating of merchants featured would be declining.)

Zervas looked at deals in New York, Boston, San Francisco, and Seattle. The analysis was based on nearly 12,000 deals that ran from January 1, 2010 to March 31, 2012.

"The slope of the trend line is negative in all four cases; indicating Groupon deal quality is, on average, decreasing over time," Zervas wrote. "In all four cases, the correlation between time and expected Yelp rating is negative, and statistically significant."

The study also looked specifically at low-rated deals, defined as those with three or fewer stars on Yelp. "Low-rated deals appear to be increasing in frequency," Zervas wrote.

"Study: Groupon's Merchant Quality Is On The Downslide," VentureBeat, May 14, 2012, available at: http://venturebeat.com/2012/05/14/study-groupons-merchant-quality-is-on-the-downslide/#F8y71QCGMKemKPMU.99.[15]

### (7) Groupon vouchers were subject to long refund periods which obscured determination of future refunds.

103. The Groupon Promise entitled voucher purchasers that redeemed their vouchers at any time prior to expiration to receive a full refund if unsatisfied, or if availability restrictions (travel vouchers) or medical qualifications (e.g., LASIK or cool sculpting vouchers) prohibited the vouchers from being successfully redeemed. As a result, Groupon's refund period often

---

[14] Yelp is a leading provider of online local search and reviews, on its website, www.yelp.com, and its mobile applications for iPhones and Android-based smartphones.

[15] Groupon's deal quality also deteriorated internationally in 2011. In 2011, Britain's Advertising Standards Authority ruled against Groupon fifty separate times, including violations for offering "breast enhancement" that did not work and for misrepresenting the actual price of goods to hide the fact that the voucher it was offering was not actually a discount. *See* "Groupon Breaches ASA Code for 49th and 50th Time In 2011," *The Guardian*, December 7, 2011, available at: http://www.guardian.co.uk/technology/2011/dec/07/groupon-breaches-asa-code.

extended six to nine months, and sometimes more – another factor that FAS 48 recognizes as an impediment to making a reasonable return estimate.

104.    Each of the impediments outlined in Sections VI(b)(1) to VI(b)(7) alone was sufficient to render a refund estimate unreasonable and unreliable.   Together, these factors unquestionably demonstrated that Groupon was incapable of reasonably determining its refund rate.

**VII.    Groupon Recklessly Or Intentionally Continued Its Improper Accounting In Its Fourth Quarter 2011 Earnings Announcement.**

105.    By the time that Groupon announced Q4 2011 earnings on February 8, 2012, Groupon and its executives had actual knowledge or recklessly disregarded information known within Groupon and accessible to its executives indicating that their refund estimate was unreliable and was not accurately tracking Groupon's actual refund experience.

106.    First, they had access to both sales and refund data in real time, and would therefore know when that data deviated from their unreliable and unreasonable estimate.  As CW 1 indicated, the growing refund rate was reflected in Groupon's Salesforce database program. Defendants Mason, Del Preto, and Child each had access to Groupon's Salesforce program, and regularly utilized information from that program in the course of their job duties. Additionally, CW 7, a Product Manager and Senior Executive in charge of Groupon Goods between November 2011 and July 2012, indicated that Groupon's senior executives also received weekly analytics and trend reports further parsing the data from Salesforce.  The reports were generated by a dedicated data analytics team in Palo Alto, California.

107.    Through these reports, by January 2012, Defendants Mason, Del Preto, Child (and Defendant Groupon, through these executives and other employees and agents working within the scope of their duties, including sales and customer service managers, and the data analytics

team described in Paragraph 106 above), would have known, or in the alternative, recklessly ignored that 2011 vouchers were being refunded at an elevated rate.

108.    Second, Groupon and its executives had actual knowledge prior to the IPO that Groupon's ability to accelerate revenue was predicated on its ability to satisfy the strict requirements for accruing a reasonable refund estimate under SAB Topic 13.  *See* Paragraph 79. These Defendants also knew, or recklessly ignored, that Groupon could not satisfy the requirements of SAB Topic 13.  *See* Paragraphs 80 to 104.  Specifically, Groupon and its executives knew, from access to information about the range and metrics of deals that Groupon offered, and from metrics regarding merchant partners referenced in investor presentations, that most of Groupon's deals in Q4 2011 were with merchants that were either new, or with which Groupon had only a limited experience, in virtually all cases far less than the two years referenced in SAB Topic 13 and SAB 104.

109.    Third, Groupon and its executives knew, or recklessly ignored, that Groupon was making a concentrated push into higher-priced sales, which Mason understood to have an inherently higher refund rate.  *See* Paragraph 90.   Reflecting the shift into higher-priced deals, the Registration Statement that both Defendants Mason and Child signed showed that the average deal price rose substantially in the first nine months of 2011.  It states that Groupon sold 30,296,070 vouchers in 2010 for gross billings of 745,348,000, suggesting that the average deal price in 2010 was $24.60.  However, for the first nine months of 2011, the average deal price rose almost 20% to $29.42 (93,629,524 vouchers sold for gross billings of $2,754,633,000).  *See* Registration Statement at 50.  Thus, even before the end of the calendar year, Defendants knew that Groupon had shifted to a deal mix emphasizing higher-priced deals with the "inherently" higher refund rate.

110.    Fourth, Groupon and its executives knew, or recklessly ignored, that Groupon's Q4 2011 revenues included substantial sales of vouchers for medical services like LASIK and cool sculpting, and expressly understood that such sales had a higher "expected" and "pre-baked-in" refund rate because Groupon did not screen to determine whether its customers were qualified for these medical services.  In particular, Groupon's disastrous experiment in early 2011 with LASIK deals confirmed that the refund rate was substantial.  *See* Paragraphs 90 to 92 above.

111.    Fifth, Groupon and its executives also had actual knowledge, or recklessly ignored, that they had not yet implemented effective estimation controls and other internal controls.  Groupon executives Mason and Child in particular knew this to be the case because they were in charge of implementing those controls, and by the time Groupon filed its 10-K only seven weeks later, would have to certify under law that those controls were effective.

112.    Sixth, Groupon and its executives knew that they were maintaining a refund reserve cushion that was far less, relative to its burgeoning sales, than it maintained in prior years, and had no reasonable basis for reducing its reserve ratio.  *See* Paragraph 96.

113.    Seventh, in addition to all of the internal data warning of a severe refund risk, Groupon also received external warnings.  In September 2011, tech analyst Rakesh Agrawal asked Groupon's public relations department to address what he perceived to be a substantial refund risk going forward, and was falsely assured by Groupon that "refunds weren't an issue." *See* "Why Groupon Is Poised For Collapse," VentureBeat, March 31, 2012, available at: http://venturebeat.com/2012/03/31/why-groupon-is-poised-for-collapse/.

114.    Despite their actual or constructive knowledge of growing refund risk, unreliability of reserve estimates, and their lack of qualification under GAAP to recognize

revenues before the refund period expired, Groupon and its executives continued to improperly accelerate revenue recognition. On February 8, 2012, these Defendants announced purportedly "strong" inflated financial results for the Q4 2011 and full year 2011 that were premised on its then-obviously defective refund accounting. *See* February 8, 2012 Press Release and February 8, 2012 8-K, which was signed by Defendant Child.

115. In the February 8, 2012 Press Release, Groupon continued to improperly accelerate recognition of revenue subject to a right of refund, even though it knew that its refund model was incapable of reasonably estimating actual refund rates. Because of this improper refund accounting, Groupon was able to report strong fourth quarter revenues and, to the delight of analysts, an operating profit. According to the February 8, 2012 Press Release, Groupon's Q4 2011 revenue increased 194% to $506.5 million, as compared against $172.2 million in the fourth quarter of 2010. For Full-Year 2011, it reported revenue of $1.62 billion, up 419% from $312.9 million in 2010. The February 8, 2012 Press Release also touted purported Q4 2011 operating income of $15 million, as compared with an operating loss of $336.1 million in the fourth quarter of 2010. It boasted: "[t]his marks the company's first quarter of operating profitability since Groupon began its international operations in the second quarter of 2010." For Full-Year 2011, it reported operating loss of $203.4 million, down from a loss of $420.3 million in 2010.

116. The representations described in Paragraph 115 above were materially false and misleading when made because: (a) the revenue figure was inflated by inclusion of revenue that was required to be deferred under GAAP because it was derived from the sales of vouchers unconditionally guaranteed under the Groupon Promise, but for which Groupon was incapable of generating a reasonable estimate of refunds; (b) Groupon had not earned an "operating profit"

but instead only created the illusion of one by falsely inflating revenues and using an unreliable estimate of future refunds instead of properly deferring revenue as required under GAAP; (c) the statements omitted that Groupon's refund assumptions were not reasonable and materially understated its refund rate; (d) the statements omitted that Groupon had shifted to a deal mix emphasizing higher-priced travel, medical and aesthetic deals which had higher refund rates not accounted for in Groupon's "refund estimate," further rendering it unreliable; and (e) the statements omitted that Groupon had material weakness in its internal controls for closing accounting periods, calculating key accounting metrics, and, most importantly, estimating refunds.

117.    On the earnings conference call that Groupon held with investors later in the day on February 8, 2012, Defendant Mason stated that

> 2011 was a phenomenal year for Groupon. At $1.6 billion in revenue, we grew nearly 420% this year.…Q4 in particular, was a milestone, as it was the first quarter in which we have generated operating profit since expanding internationally back in Q2 2010. Quarter-over-quarter, we also saw revenue accelerate by 18% to $506.5 million.

These statements were materially false and misleading when made because: (a) the revenue figure was inflated by inclusion of revenue that was required to be deferred under GAAP because it was derived from the sale of vouchers unconditionally guaranteed under the Groupon Promise, but for which Groupon was incapable of generating a reasonable estimate of refunds; (b) Groupon had not earned an "operating profit" but instead only created the illusion of one by falsely inflating revenues and using an unreliable estimate of future refunds instead of properly deferring revenue as required under GAAP; (c) the statements omitted that Groupon's refund assumptions were not reasonable and materially understated its refund rate; (d) the statements omitted that Groupon had shifted to a deal mix emphasizing higher-priced travel, medical and aesthetic deals which had higher refund rates not accounted for in Groupon's "refund estimate,"

further rendering it unreliable; and (e) the statements omitted that Groupon had material weakness in its internal controls for closing accounting periods, calculating key accounting metrics, and, most importantly, estimating refunds.

118.    On that same February 8, 2012, conference call, Defendant Child stated

> Fourth quarter worldwide revenue, which is defined as the portion of gross billings that we keep after paying our merchants, grew 194% year-over-year to $506.5 million…. Fourth quarter gross billings and revenue were reflective of strong growth in our daily deals business and in our new travel, entertainment, and e-commerce channels. Strength in daily deals was reflected in part by the increase in revenue margin, or revenue as a percentage of gross billings, on a quarter-over-quarter basis….Fourth quarter GAAP operating income improved to $15 million from a loss of $336.1 million in the fourth quarter of 2010.

These statements were materially false and misleading when made because: (a) the revenue figure was inflated by inclusion of revenue that was required to be deferred under GAAP because it was derived from the sale of vouchers unconditionally guaranteed under the Groupon Promise, but for which Groupon was incapable of generating a reasonable estimate of refunds; (b) Groupon had not earned an "operating profit" but instead only created the illusion of one by falsely inflating revenues and using an unreliable estimate of future refunds instead of properly deferring revenue as required under GAAP; (c) the statements omitted that Groupon's refund assumptions were not reasonable and materially understated its refund rate; (d) the statements omitted that Groupon's new deal mix, emphasizing higher-priced travel, medical and aesthetic deals, had higher refund rates not accounted for in Groupon's "refund estimate," further rendering it unreliable; and (e) the statements omitted that Groupon had material weakness in its internal controls for closing accounting periods, calculating key accounting metrics, and, most importantly, estimating refunds.

119.    Later in February, 2012, Defendant Del Preto put Defendants Child and Mason on actual notice that Groupon's internal controls were broken, warning them that refunds were

coming in at a far faster pace than the number they had used to derive the revenue and operating profit figures reported to investors. *See* "SEC Probes Groupon," *The Wall St. Journal*, April 3, 2012.

120.    Despite actual knowledge that Groupon's financials were predicated on an unreasonable earnings estimate, neither the Company nor Defendants Mason or Child made any effort to correct their earlier material misrepresentations. To the contrary, in a presentation he made at a Barclays Capital investors conference on March 13, 2012, Defendant Child reiterated earlier material misrepresentations. He stated that the daily deal business continued to be "very, very strong in all categories," and again boasted that Groupon had achieved a fourth quarter operating profit, despite having been told by Defendant Del Preto weeks earlier that the extremely aggressive refund assumptions underpinning its financial reporting had been definitively proven false.

121.    The statements identified in Paragraph 120 above were materially false and misleading when made because: (a) Groupon had not earned an "operating profit" but instead only created the illusion of one by properly accelerating revenues in violation of GAAP and using an unreasonable, lowball estimate of future refunds that materially understated its refund rate; (b) the statements omitted that Groupon had material weakness in its internal controls for the closing of accounting periods, the calculation of key accounting metrics, and the estimation of refunds; and (c) Groupon's results were not "very, very strong in all categories;" to the contrary, some categories were experiencing significantly elevated levels of refunds, which Child knew at the time he made these statements.

**VIII.   Groupon Discloses That Its Refund Accounting Was Improper And Unreliable.**

122.    Groupon kept its accounting violations hidden for as long as it could.  However, SEC rules required Groupon to file its audited annual report on Form 10-K on or before March 30, 2012.  Accordingly, in the late afternoon on March 30, 2012, Groupon issued a press release (the "March 30, 2012 Press Release") announcing a significant revision of its reported financial results for its Q4 2011 and Full-Year 2011, filed the March 30, 2012 Press Release with the SEC as an attachment to the March 30, 2012 8-K, and filed its 2011 10-K.

123.    The March 30, 2012 Press Release and the March 30, 2012 8-K disclosed that the financial results reported on February 8, 2012 were erroneous and that the internal controls described in the Registration Statement and Prospectus were deficient.   Specifically, the Company revised all of the following financial metrics:

a.      Revenues.  Groupon's Q4 2011 and Full-Year revenue were revised downward by $14.3 million.

b.      Operating income.  Directly negating the Company's prior boasts about Q4 2011 being its first quarter of operating profitability, Groupon's Q4 2011 operating income was changed to an operating loss of $15 million.  Full-Year 2011 operating loss was also revised to $233.4 million.

c.      Operating expenses.  Groupon's total operating expenses were revised upward to $507.1 million in Q4 2011 and $1.84 billion for Full-Year 2011.

d.      Cost of revenue.  Groupon's cost of revenue was revised upward to $96.3 million for Q4 2011 and $258.9 million for Full-Year 2011.

e.      Pro-forma net income (loss) / Earnings per share.  Groupon's Q4 2011 pro-forma net loss was revised to $32.5 million, which translated into a larger pro-forma loss of $0.06 per

share. The Company's Full-Year 2011 pro-forma net loss was also revised to $284.4 million, which equated to a larger pro-forma loss of $0.79 per share.

124.    The March 30, 2012 Press Release attributed these revisions primarily to a gross underestimation of refunds:

> The revisions resulted in a reduction to fourth quarter 2011 revenue of $14.3 million. The revisions also resulted in an increase to fourth quarter operating expenses that reduced operating income by $30.0 million, net income by $22.6 million, and earnings per share by $0.04....

> The revisions are primarily related to an increase to the Company's refund reserve accrual to reflect a shift in the Company's fourth quarter deal mix and higher price point offers, which have higher refund rates. The revisions have an impact on both revenue and cost of revenue.

125.    The March 30, 2012 Press Release also disclosed that the Company's outside auditor determined that Groupon's internal controls were materially weak:

> In conjunction with the completion of the audit of Groupon's financial statements for the year ended December 31, 2011 by its independent auditor, Ernst & Young LLP, the Company included a statement of a material weakness in its internal controls over its financial statement close process in its Annual Report on Form 10-K for year ended December 31, 2011. The Company has been working for several months with another global accounting firm in preparation for reporting on the effectiveness of its internal controls by the end of 2012, as required following Groupon's initial public offering last year. The Company continues to implement process improvement initiatives and augment its staffing, and is expanding the accounting firm's engagement scope to address the underlying causes of the material weakness. Further discussion of the material weakness can be found in the Company's Form 10-K, filed today with the SEC.

126.    The 2011 10-K confirmed that Groupon's management, including Defendants Mason and Child, had also found material weaknesses in internal controls, especially those regarding estimation of refunds, calculation of accurate financial results, and proper reconciliation of accounts:

> Our management, with the participation of our Chief Executive Officer and our Chief Financial Officer, evaluated the effectiveness of our disclosure controls and procedures as of December 31, 2011. The term "disclosure controls and

procedures," as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), means controls and other procedures of a company that are designed to ensure that information required to be disclosed by a company in the reports that it files or submits under the Exchange Act is recorded, processed, summarized and reported, within the time periods specified in the SEC's rules and forms. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by a company in the reports that it files or submits under the Exchange Act is accumulated and communicated to the company's management, including its principal executive and principal financial officers, as appropriate to allow timely decisions regarding required disclosure. Management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving their objectives and management necessarily applies its judgment in evaluating the cost benefit relationship of possible controls and procedures. ***Based on this evaluation, management concluded as of December 31, 2011 that our disclosure controls and procedures were not effective at the reasonable assurance level due to a material weakness in our internal control over financial reporting, which is described below.***

***In connection with the preparation of our financial statements for the year ended December 31, 2011, we concluded there is a material weakness in the design and operating effectiveness of our internal control over financial reporting as defined in SEC Regulation S-X. A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting such that there is a <u>reasonable possibility that a material misstatement of the annual or interim financial statements will not be prevented or detected on a timely basis</u>. The primary factors contributing to the material weakness, which relates to our financial statement close process, were***:

- ***We did not maintain financial close process and procedures that were adequately designed, documented and executed to support the accurate and timely reporting of our financial results.*** As a result, we made a number of manual post-close adjustments necessary in order to prepare the financial statements included in this Form 10-K.

- ***We did not maintain effective controls to provide reasonable assurance that accounts were complete and accurate and agreed to detailed support, and that account reconciliations were properly performed,***

*reviewed and approved.* While these activities should be performed in the ordinary course of our preparing our financial statements, we instead needed to undertake significant efforts to complete reconciliations and investigate items identified in those reconciliations during the course of our financial statement audit.

• *We did not have adequate policies and procedures in place to ensure the timely, effective review of estimates, assumptions and related reconciliations and analyses, including those related to customer refund reserves.* As noted previously, our original estimate disclosed on February 8 of the reserve for customer refunds proved to be inadequate after we performed additional analysis.

127.     Analysts and the business press criticized the Company both for the actual GAAP violation and for the fact that the Company's lack of controls and candor made it difficult to trust Groupon going forward.  For instance:

a.       On March 30, 2012, an analyst at Susquehanna Financial Group commented to Reuters, "When you're a public company, there's a certain level of expectations for financial controls.  It's probably because it's such a fast growing business that it doesn't have all the systems in place.  Maybe they don't have enough financial personnel."

b.       On April 2, 2012 Ascendiant Capital Markets issued a report rating Groupon as Sell. As the report noted:

**Restatement and lack of controls presents more uncertainty:**  In our view, the Q4 restatement and weakness in controls are likely to bolster the pervasive skepticism as to the company's valuation, growth prospects, and profit potential. Profitability has already been weak, and higher refund levels will further challenge this.  We question whether Groupon can sustain its high growth and begin to generate sizeable profits while scaling back marketing and other operating costs.

c.       Also on April 2, 2012, *The Wall St. Journal* quoted the head of financial reporting policy for the CFA Institute, an organization that represents chartered financial analysts who work with individual investors, questioning whether Groupon was competent to report as a

public company: "It really demonstrates, for an IPO, were they really ready to go?  Did they have the financial systems, did they have the processes and procedures in place?"  The same article quoted an Evercore Partners analyst concluding that Groupon's admissions were "going to definitely unsettle a lot of investors."

       d.    *The New York Times' Deal Book* called the restatement "unexpected" and said that it "raised questions about the accounting practices of the newly public company."  It added that the material weakness disclosure "highlights current concerns about the reliability of Groupon's financial statements."

       e.    On April 2, 2012, *The Wall St. Journal* reported, "The surprise announcement raised questions about the reliability of Groupon's numbers at a moment when it is trying to build confidence of Wall Street investors."

       128.    As a direct and proximate result of Groupon's revelations, Groupon's stock price fell $3.10, or 16.9%, from $18.38 to $15.28.

       129.    The following day, *The Wall St. Journal* reported that the SEC had commenced an informal probe into Groupon's accounting disclosures, sending shares down another $.26, or 1.7%, to $15.02.

## CLASS ACTION ALLEGATIONS

       130.    Plaintiff brings this action as a class action pursuant to Fed. R. Civ. P. 23(a) and (b)(3) on behalf a Class consisting of: (a) all persons or entities who purchased or otherwise acquired the common stock of Groupon pursuant and/or traceable to the IPO between November 4, 2011 through and including March 30, 2012 (the "Securities Act Class Period"); and (b) all persons who purchased or otherwise acquired the common stock of Groupon between February 8, 2012 through and including March 30, 2012 (the "Exchange Act Class Period").  Excluded

from the Class are Defendants herein, the officers and directors of the Company, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

131. The Class members are so numerous that joinder of all is impracticable. Groupon's IPO involved the sale of 35 million shares of its common stock, which throughout the Class Period were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Groupon or its transfer agent, BNY Mellon. Class members may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

132. Plaintiff's claims are typical of the claims of the Class members, as all are similarly affected by Defendants' wrongful conduct in violation of federal securities law that as alleged herein.

133. Plaintiff will fairly and adequately protect the interests of the Class members and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

134. Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. Among the questions of law and fact common to the Class are:

- whether the Securities Act was violated by the Registration Statement and Prospectus filed herein;
- whether statements made by Defendants in the Registration Statement and Prospectus misrepresented and omitted material facts about the business, operations, financial performance, management, and internal controls of Groupon;

- whether the Exchange Act was violated by misrepresentation whether the Individual Defendants caused Groupon to issue false and misleading statements during the Class Period;

- whether the February 8, 2012 Press Release, February 8, 2012 8-K, and conference call representations quoted herein contained material misrepresentations and omissions in violation of the Exchange Act;

- whether material misrepresentations and omissions made in the Exchange Act Class Period caused losses for Exchange Act Sub-class members; and

- whether the Class members have sustained damages and, if so, what is the proper measure of damages, for misrepresentations made in the Exchange Act Class Period.

135.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all Class members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for Class members to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

136.    With respect to Plaintiff's Exchange Act claims, Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Exchange Act Class Period;

- the omissions and misrepresentations were material;

- Groupon common stock is traded in efficient markets;

- the Company's shares were liquid and traded with moderate to heavy volume during the Exchange Act Class Period;

- the Company traded on the NASDAQ, and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiffs and Class members purchased and/or sold Groupon common stock between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

137.    Based upon the foregoing, Plaintiff and the Class members are entitled to a presumption of reliance upon the integrity of the market during the Exchange Act Class Period.

## CLAIMS FOR RELIEF

### COUNT I

**(Against All Defendants)**
**For Violation of Section 11 of the Securities Act**

138.    Plaintiff repeats and realleges allegations 1 to 104 and 122 to 137 above. Allegations contained in paragraphs 105 to 121 are expressly not part of this claim.  This claim is premised on strict liability under Section 11 of the Securities Act, and does not assert that Defendants acted with fraudulent intent.

139.    This claim is asserted by Plaintiff against all Defendants on behalf of all persons who acquired shares of the Company's common stock pursuant to and/or traceable to the Company's November 4, 2011 IPO, in which the shares registered under the Registration Statement were sold.

140.    The Individual Defendants are strictly liable under the Securities Act as signatories of the Registration Statement for the misrepresentations and omissions contained therein, as identified in Paragraphs 59 to 104 above.  Defendants Lefkofsky, Mason, Efrusy, Leonsis and Schultz are further strictly liable under the Securities Act for misrepresentations and omissions in the Registration Statement because they were directors of the Company at the time of its filing.

141.    Groupon is strictly liable as the Issuer under the Securities Act for the misrepresentations and omissions it made in the Registration Statement, as identified in Paragraphs 59 to 104.

142.     The Underwriter Defendants are strictly liable under the Securities Act as named underwriters for the misrepresentations and omissions made in the Registration Statement, as identified in Paragraphs 59 to 104.

143.     None of the Defendants named herein conducted a reasonable investigation or possessed a reasonable basis for the belief that the statements contained in the Registration Statement and identified in Paragraphs 59 to 104 above were true, were without omissions of material fact, and were not misleading.

144.     By reason of the conduct alleged herein, each of the Defendants has violated Section 11 of the Securities Act.

145.     Plaintiff and the Class have sustained enormous damages because the value of their Groupon common stock has declined precipitously.

146.     At the time of their purchases, Plaintiff and the Class were without knowledge of the wrongful conduct alleged herein, and could not have reasonably discovered those facts more than one year prior to the filing of the initial complaint in this action.  The initial complaint was filed within three years of the time that Groupon first offered the shares covered by the Registration Statement to the investing public.

147.     By virtue of the foregoing, Plaintiff and the other Class members are entitled to damages under Section 11 as measured by the provisions of Section 11(e), from the Defendants and each of them, jointly and severally.

## COUNT II

### (Against the Underwriting Defendants)
### For Violations of Section 12(a)(2) of the Securities Act

148.     Plaintiff repeats and realleges allegations 1 to 104 and 122 to 137 above. Allegations contained in paragraphs 105 to 121 are expressly not part of this claim.  This claim is

premised on the remedies available under Section 12 of the Securities Act, and does not assert that Defendants acted with fraudulent intent.

149.     This claim is asserted by Plaintiff against the Underwriting Defendants, on behalf of all persons who acquired shares of the Company's common stock pursuant to the November 4, 2011 IPO.

150.     By means of the Registration Statement and Prospectus, each of the Underwriter Defendants offered, promoted, and sold Groupon common stock in the IPO, and therefore was liable under Section 12(a)(2) for the misrepresentations and omissions contained in the Prospectus and repeated in the Registration Statement.

151.     None of the Underwriter Defendants named herein conducted a reasonable investigation or possessed a reasonable basis for the belief that the statements contained in the Registration Statement and Prospectus, and identified in Paragraphs 59 to 104 above were true, were without omissions of material fact, and were not misleading.

152.     By reason of the conduct alleged herein, each of the Underwriter Defendants has violated Section 12(a)(2) of the Securities Act.

153.     Plaintiff and the Class have sustained enormous damages because the value of their Groupon common stock has declined precipitously.

154.     Plaintiff and the Class hereby tender their shares to the Underwriter Defendants and demand rescission.

155.     At the time of their purchases, Plaintiff and the Class were without knowledge of the wrongful conduct alleged herein, and could not have reasonably discovered those facts more than one year prior to the filing of the initial complaint in this action.  The initial complaint was

filed within three years of the time that the Underwriter Defendants first sold Groupon shares to the investing public.

## COUNT III

### (Against the Individual Defendants)
### For Violation of Section 15 of The Securities Act

156.    Plaintiff repeats and realleges allegations 1 to 104 and 122 to 137 above. Allegations contained in paragraphs 105 to 121 are expressly not part of this claim.  This claim is premised on control person liability under Section 15 of the Securities Act, and does not assert that Defendants acted with fraudulent intent.

157.    The Individual Defendants, by virtue of their offices, directorship and specific acts were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of Groupon within the meaning of Section 15 of the Securities Act.  The Individual Defendants had the power and influence and exercised the same to cause Groupon to engage in the acts described herein.

158.    Specifically, the Audit Committee Defendants, by virtue of their obligation to oversee financial reporting, acted as control persons of Groupon and its executive defendants, Mason, Del Preto and Child, in connection with the materially false and misleading financial statements and notes thereto, and misrepresentations regarding Groupon's financial reporting controls, contained in the Registration Statement.

159.    Defendants Lefkofsky and Mason, as the Executive Chairman and Chief Executive Officer, respectively, exercised control by virtue of their positions over Groupon, and Defendants Del Preto and Child, their subordinates.

160.    Defendant Child exercised control by virtue of his postion over Groupon and his subordinate, Defendant Del Preto.

161.    Defendant Del Preto exercised control by virtue of his position over the financial reporting of Groupon.

162.    The Individual Defendants' positions made them privy to and provided them with actual knowledge of the material facts concealed from Plaintiff and the Class.

163.    By virtue of the conduct alleged herein, the Individual Defendants are liable as control persons for the violations of Section 11 by the persons they controlled, as alleged in Count I.

164.    None of the Individual Defendants named herein conducted a reasonable investigation or possessed a reasonable basis for the belief that the statements contained in the Registration Statement and identified in Paragraphs 59 to 104 above were true, were without omissions of material fact, and were not misleading.

165.    Each of the Individual Defendants is liable to Plaintiff and the Class for damages suffered as a result of the Securities Act violations of the persons they controlled.

## COUNT IV

### (Against Defendants Groupon, Mason and Child)
### For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder

166.    Plaintiff repeats and realleges the allegations contained in Paragraphs 1 to 137 above, as if fully set forth herein.

167.    This Count is asserted against all Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

168.    Between at least February 8, 2012 through March 30, 2012, Defendants Groupon, Mason and Child engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other Class members; made

various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, during this time period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Groupon common stock; and (iii) cause Plaintiff and other Class members to purchase Groupon common stock at artificially inflated prices.

169. Specifically, with reckless disregard for or actual knowledge of the falsity of their financial accounting, Defendants Groupon, Mason and Child each reported false financial results for Q4 2011 in the February 8, 2012 Press Release, the February 8, 2012 8-K, and the February 8, 2012 earnings conference call, and in the case of Defendants Groupon and Child, in a presentation at a Barclays investor conference, and omitted material adverse information regarding weaknesses in Groupon's internal controls therein, as is detailed in Paragraphs 105 to 121 above.

170. As detailed in Paragraphs 105 to 122 above, these statements were false and misleading, *inter alia*, because they misrepresented Groupon's revenue and operating results, predicated their aggressive revenue recognition on an unreliable and unreasonable assumption of refund rates in violation of accounting standards they knew and understood to be authoritative, omitted that Groupon had material weakness in its process for assuming future refund rates and calculating financial results, and omitted that Groupon's financial reporting violated GAAP.

171. By virtue of their positions at Groupon, information, and access to records detailed in Paragraphs 105 to 121 above, Defendants Mason and Child each either had actual

70

knowledge of the materially false and misleading nature of the Class Period representations alleged in Paragraphs 105 to 121 above, or, in the alternative, acted with reckless disregard for the truth in that they ignored information readily available to them indicating the materially false and misleading nature of the statements made.

172.    Scienter is imputed as to the corporation, Groupon, from the actual and constructive knowledge, including reckless disregard for the truth, of Defendants Mason, Child, Del Preto, and other employees acting in the course of their employment, including those in Groupon's public relations department who were expressly warned of Groupon's refund risk in September 2011 as set forth in Paragraph 113.

173.    Without knowledge of the adverse facts concerning Groupon that were concealed by Defendants Groupon, Mason and Child, Plaintiff and the other Class members purchased Groupon common stock at artificially inflated prices between February 8, 2012 and March 30, 2012, and relied upon the price of the common stock, the integrity of the market for the common stock, and/or upon statements disseminated by Defendants Groupon, Mason and Child, and were damaged thereby.

174.    During the Class Period, and specifically during the portion thereof beginning on February 8, 2012 and ending on March 30, 2012, Groupon securities were traded on an active and efficient market.

175.    Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein made by Defendants Groupon, Mason and Child between February 8, 2012 and March 30, 2012, and/or relying upon the integrity of the market, purchased shares of Groupon common stock at prices artificially inflated by the material misrepresentations and omissions alleged in Paragraphs 105 to 121 above.   Had Plaintiff and the other Class

71

members known the truth, they would not have purchased Groupon's common stock or would not have purchased it at the inflated prices that were paid.

176.    The market price of Groupon common stock declined sharply upon public disclosure of the true facts misrepresented during the Class Period, disclosure of the material adverse information concealed during the Class Period, and/or materialization to the risks concealed by Class Period misrepresentations.

177.    By reason of the conduct alleged herein, Defendants Groupon, Mason and Child knowingly or recklessly violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

178.    As a direct and proximate result of the wrongful conduct by Defendants Groupon, Mason and Child, Plaintiff and the other Class members suffered damages in connection with their respective purchases and sales of Groupon's common stock during the Class Period. Defendants Groupon, Mason and Child are liable to Plaintiff and the Class for these damages.

## COUNT V
### (Against the Audit Committee Defendants, Lefkofsky and Mason)
### For Violations of Section 20(a) of the Exchange Act

179.    Plaintiff repeats and realleges the allegations contained in Paragraphs 1 to 137 and 166 to 178 above, as if fully set forth herein.

180.    During the Class Period, and in particular the portion thereof beginning on February 8, 2012 and March 30, 2012, the Audit Committee Defendants, by virtue of their directorships and obligations under the audit committee charter to oversee financial reporting and internal controls, were control persons of Groupon, Mason and Child within the meaning of Section 20(a) of the Exchange Act, and are liable under Section 20(a) for their violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

181.    During the Class Period, Defendants Lefkofsky and Mason, by virtue of their positions, respectively, as Executive Chairman and Chief Executive Officer, were control persons of Groupon and Defendant Child, their subordinate, within the meaning of Section 20(a) of the Exchange Act, and are liable under Section 20(a) for Groupon's and Child's violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.    Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiff and the other Class members prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs;

D.    Awarding rescissionary damages; and

E.    Awarding such equitable, injunctive or other relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands trial by jury of all issues that may be so tried.

Dated:  October 29, 2012

**POMERANTZ GROSSMAN HUFFORD
DAHLSTROM & GROSS LLP**

By: /s/ Joshua B. Silverman
Joshua B. Silverman
Patrick V. Dahlstrom
Louis C. Ludwig
10 South LaSalle Street, Suite 3505
Chicago, Illinois 60603
Phone: 312-377-1181
Fax: 312-377-1184
jbsilverman@pomlaw.com
pvdahlstrom@pomlaw.com
lcludwig@pomlaw.com

**POMERANTZ GROSSMAN HUFFORD
DAHLSTROM & GROSS LLP**
Marc I. Gross
Jeremy A. Lieberman
Matthew L. Tuccillo
600 3rd Avenue, 20th Floor
New York, New York 10016
Phone: 212-661-1100
Fax: 212-661-8665

**CAFFERTY CLOBES MERIWETHER
& SPRENGEL LLP**
Dom J. Rizzi
30 North LaSalle Street, Suite 3200
Chicago, Illinois 60602
Phone: 734-769-2144
Fax: 734-769-1207

**BRONSTEIN GEWIRTZ &
GROSSMAN LLC**
Peretz Bronstein
Edward N. Gewirtz
Neil D. Grossman
60 East 42nd Street, Suite 4600
New York, New York 10165
Phone:  212-697-6484
Fax:  212-697-7296

***Counsel for Plaintiff and the Class***